Nos. 23-11173, 23-11196

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**STATE OF ALABAMA ex rel., STEVE MARSHALL, ATTORNEY GENERAL, the ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT; ALABAMA POWER COMPANY, and POWERSOUTH ENERGY COOPERATIVE,**

**Petitioners,**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, in his capacity as Administrator, United States Environmental Protection Agency,**

**Respondents.**

---

**Petition for Review of Action of the U.S. Environmental Protection Agency**

---

**BRIEF OF ALABAMA AND INDUSTRY PETITIONERS**

---

*Counsel Listed on Inside Cover*

**Steve Marshall**
   *Attorney General of Alabama*
**Robert D. Tambling**
   *Assistant Attorney General*
**Lindsay D. Barton**
   *Assistant Attorney General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 242-2848
E-Mail: Robert.Tambling@AlabamaAG.gov

**Paul Christian Sasser, Jr.**
   *Assistant Attorney General*
**Steven Shawn Sibley**
   *Assistant Attorney General*
ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
OFFICE OF GENERAL COUNSEL
P.O. Box 301463
Montgomery, Alabama 36130-1463
Phone: (334) 271-7855
Fax: (334) 260-4544
Email: pcsasser@adem.alabama.gov
        ssibley@adem.alabama.gov

*Counsel for the State of Alabama and*
*Alabama Department of Environmental Management*

**C. Grady Moore, III**
**Claire B. Johnson**
BALCH & BINGHAM LLP
1901 6th Avenue N., Ste. 1500
Birmingham, Alabama 35203
Phone: (205) 251-8100
Email: gmoore@balch.com

*Counsel for Alabama Power Company and*
*PowerSouth Energy Cooperative*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel certifies the following corporate disclosure statements:

Alabama Power Company ("Alabama Power") is a corporation organized under the laws of the State of Alabama. Alabama Power is a regulated public utility engaged in the generation, transmission, distribution and purchase of electricity and the sale of electric service within a service area comprising most of the State of Alabama. The Southern Company (trading symbol "SO") owns all of Alabama Power's outstanding common stock, which represents a substantial majority of the overall voting power of Alabama Power's equity securities. Alabama Power also has preferred stock outstanding, all of which are publicly traded (trading symbol "ALP PR Q" for 5.00% Series Class A Preferred Stock).

PowerSouth Energy Cooperative ("PowerSouth") is a non-profit generation and transmission cooperative, providing the wholesale power needs of twenty distribution members—sixteen electric cooperatives and four municipal electric systems—for more than one-million end users in thirty-nine Alabama and ten northwest Florida counties. PowerSouth is owned by its twenty distribution members. PowerSouth does not have a parent corporation and has not issued shares

to the public. No publicly held company has a 10% or greater ownership in PowerSouth.

Undersigned counsel further certifies that the following persons or entities have been associated with or have an interest in the outcome of this case:

Alabama Department of Environmental Management

Alabama Power Company (ALP-PQ)

Balch & Bingham LLP, Counsel, Alabama Power Company and PowerSouth Energy Cooperative

Barton, Lindsay S. Dawson, Counsel, State of Alabama

Garland, Merrick B., Attorney General, United States Department of Justice

Gettle, Jeananne, Acting Region 4 Administrator, United States Environmental Protection Agency

Jensen, Miranda M., United States Department of Justice

Johnson, Claire B., Counsel, Alabama Power Company and PowerSouth Energy Cooperative

Kim, Todd, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice

LeFleur, Lance R., Director, Alabama Department of Environmental Management

Lin, Albert, United States Department of Justice

Marshall, Steve, Attorney General, State of Alabama

Moore III, C. Grady, Counsel, Alabama Power Company and PowerSouth Energy
  Cooperative

PowerSouth Energy Cooperative

Prieto, Jeffrey M., General Counsel, United States Environmental Protection
  Agency

Regan, Michael S., Administrator, United States Environmental Protection Agency

SABIC Innovative Plastics US, LLC

Sasser, Paul Christian, Jr., Counsel, Alabama Department of Environmental
  Management

Saudi Basic Industries Corporation (2010.SR)

Sibley, Steven Shawn, Counsel, Alabama Department of Environmental
  Management

State of Alabama

The Southern Company (SO) (Parent Company of Petitioner Alabama Power
  Company)

Tambling, Robert D., Counsel, State of Alabama

United States Environmental Protection Agency

**Dated: September 20, 2023**

> Respectfully submitted,
>
> STEVE MARSHALL
> ATTORNEY GENERAL

/s/ Robert D. Tambling

Robert D. Tambling (TAM001)

*Assistant Attorney General*

/s/ Lindsay S. Dawson Barton

Lindsay S. Dawson Barton (DAW017)

*Assistant Attorney General*

**ADDRESS OF COUNSEL:**

Office of the Attorney General

501 Washington Avenue

Montgomery, Alabama 36130-0152

Telephone: (334) 242-7300

Fax: (334) 242-2848

E-Mail: [Robert.Tambling@AlabamaAG.gov](mailto:Robert.Tambling@AlabamaAG.gov)

/s/ Paul Christian Sasser, Jr.

Paul Christian Sasser, Jr.

*Assistant Attorney General*

/s/ Steven Shawn Sibley

Steven Shawn Sibley

*Assistant Attorney General*

**ADDRESS OF COUNSEL:**

Alabama Department of Environmental Management

Office of General Counsel

P.O. Box 301463

Montgomery, Alabama 36130-1463

Phone: (334) 271-7855

Fax: (334) 260-4544

Email: pcsasser@adem.alabama.gov

ssibley@adem.alabama.gov

<u>s/ C. Grady Moore III</u>
C. Grady Moore III
Claire B. Johnson
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
gmoore@balch.com

*Counsel for Alabama Power Company and PowerSouth Energy Cooperative*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners respectfully request oral argument. This case presents important issues regarding the scope of the U.S. Environmental Protection Agency's authority under the Clean Air Act and the State of Alabama's authority to regulate emission sources within the State. In addition to implicating questions of federalism and statutory interpretation, this case has significant practical consequences for the State of Alabama and its citizens and businesses, especially power generators and their ability to supply reliable and affordable electricity. Given the importance of the issues involved, as well as the technical nature of the subject matter, Petitioners believe oral argument is warranted and will assist the Court in resolving this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...............................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CITATIONS ...............................................................iv

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES...............................................................1

STATEMENT OF THE CASE...............................................................2

    I.      Statutory Background ...............................................................3

    II.     Factual Background...............................................................6

          A.     2015 Ozone NAAQS ...............................................................6

          B.     Alabama's 2018 Interstate Transport SIP for the 2015 Ozone NAAQS ...............................................................10

          C.     Alabama's 2022 Interstate Transport SIP for the 2015 Ozone NAAQS ...............................................................12

          D.     Region 4's Proposed Disapproval...............................................................13

          E.     EPA's Final Disapproval ...............................................................15

          F.     Procedural History ...............................................................17

    III.    Standard of Review ...............................................................18

SUMMARY OF THE ARGUMENT ...............................................................19

ARGUMENT ...............................................................21

    I.      EPA's Action Unlawfully Exceeded Its Statutory Authority ............21

    II.     EPA Unlawfully Rejected Alabama's Reasonable Screening Threshold...............................................................25

A.      EPA unlawfully substituted its own screening threshold for Alabama's reasonable 1 ppb threshold. ....................................26

B.      EPA unlawfully imposed extra-statutory requirements in order to reject Alabama's 1 ppb threshold.................................30

III.      EPA Improperly Usurped Alabama's Primary Role When It Rejected Alabama's Weight-of-Evidence Analysis............................36

A.      Alabama's state-specific, weight-of-evidence analysis reasonably concludes that Alabama does not significantly contribute to downwind nonattainment. ....................................37

B.      EPA Unlawfully Applied Its Own Methodology to Disapprove Alabama's SIP ......................................................46

IV.      EPA Discounted Record Evidence........................................................49

V.      Venue is Proper Only in This Court.....................................................54

A.      EPA's action disapproving Alabama's SIP is a stand-alone action. ........................................................................................54

B.      Disapproval of Alabama's SIP is locally or regionally applicable. ...................................................................................57

C.      EPA's disapproval of Alabama's SIP is not based on a determination of nationwide scope or effect............................59

CONCLUSION ........................................................................................................61

CERTIFICATE OF COMPLIANCE .......................................................................63

# TABLE OF CITATIONS

**Cases**                                                                    **Page(s)**

*Alabama Env't Council v. EPA*,
    711 F.3d 1277 (11th Cir. 2013) ......3-5, 18, 19, 21, 23, 24, 29, 31, 37, 46, 47, 53

*Alaska Dep't of Env't Conservation v. EPA*,
    540 U.S. 461 (2004)................................................... 20, 22, 24, 27, 33, 36, 37

*Am. Road & Transp. Builders Ass'n v. EPA*,
    705 F.3d 453 (D.C. Cir. 2013).............................................................57

*ATK Launch Sys., Inc. v. EPA*,
    651 F.3d 1194 (10th Cir. 2011) ........................................................57

*Azar v. Allina Health Servs.*,
    139 S. Ct. 1804 (2019)....................................................................28

*City of Arlington v. FCC*,
    569 U.S. 290 (2013)........................................................................18

*City of Seabrook v. EPA*,
    659 F.2d 1349 (5th Cir. 1981) ................................6, 21, 22, 26, 30, 47

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)........................................................................30

*EPA v. EME Homer City Generation, LP*,
    572 U.S. 489 (2014)................................................ 2, 6, 9, 16, 21, 24, 31, 49, 52

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)........................................................................30

*Florida Power & Light Co. v. Costle*,
    650 F.2d 579 (5th Cir. 1981) ...........................................................22

*Georgia Dep't of Education v. U.S. Dep't of Education*,
    883 F.3d 1311 (11th Cir. 2018) ........................................................31

*Hibbs v. Winn*,
   542 U.S. 88 (2004)..............................................................28

*Jama v. Immigration & Customs Enforcement*,
   543 U.S. 335 (2005)............................................................25

*Kentucky v. EPA*,
   Case Nos. 23-3216/23-3225, slip op. (6th Cir. July 25, 2023)...............56, 58, 59

*Luminant Generation Co. v. EPA*,
   675 F.3d 917 (5th Cir. 2012) ..................................4, 21, 22, 25, 27, 36

*Massachusetts Bd. of Ret. v. Murgia*,
   427 U.S. 307 (1976)............................................................26

*Michigan v. EPA*,
   213 F.3d 663 (D.C. Cir. 2000)...............................................31, 32

*Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).........................................................18, 49

*Nat'l Min. Ass'n v. U.S. Dep't of Lab.*,
   812 F.3d 843 (11th Cir. 2016) ..................................................49

*New York v. EPA*,
   964 F.3d 1214 (D.C. Cir. 2020)............................................29, 36

*North Dakota v. EPA*,
   730 F.3d 750 (8th Cir. 2013) .............................................22, 24, 45

*Oglala Sioux Tribe of Indians v. Andrus*,
   603 F.2d 707 (8th Cir. 1979) ...................................................48

*Prill v. NLRB*,
   755 F.2d 941 (D.C. Cir. 1985)..................................................25

*RMS of Georgia, LLC v. EPA*,
   64 F.4th 1368 (11th Cir. 2023) .......................................19, 54, 56, 58

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ...........................................................................25

*Sierra Club v. EPA*,
  939 F.3d 649 (5th Cir. 2019) ....................................................52, 53

*Sierra Club v. Ga. Power Co.*,
  443 F.3d 1346 (11th Cir. 2006) .......................................................23

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  295 F.3d 1209 (11th Cir. 2002) .......................................................18

*Texas v. EPA*,
  706 App'x 159 (5th Cir. 2017) ........................................................59

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ....................................................19, 59

*Texas v. EPA*,
  983 F.3d 826 (5th Cir. 2020) ......................................................5, 25

*Texas v. EPA*,
  Case No. 23-60069, slip op. (5th Cir. May 1, 2023) ...................55, 57

*Train v. Nat. Res. Def. Council, Inc.*,
  421 U.S. 60 (1975)............................................................3, 4, 21, 48

*Union Elec. Co. v. EPA*,
  427 U.S. 246 (1976)...........................................................3, 6, 26, 47

*Wyoming v. EPA*,
  Case No. 14-9529, slip op. (10th Cir. Aug. 15, 2023)................22, 24

## **Federal Statutes**

5 U.S.C. § 706(2)(A)...........................................................................18

5 U.S.C. § 706(2)(C)...........................................................................18

5 U.S.C. § 706(2)(D)...........................................................................18

42 U.S.C. § 7410(a) ..................................................................55

42 U.S.C. § 7410(a)(1)-(2) .........................................................3

42 U.S.C. § 7410(a)(2)(D) ...............................................5, 25, 28

42 U.S.C. § 7410(a)(3) ..............................................................19

42 U.S.C. § 7410(c)(1) ................................................................5

42 U.S.C. § 7410(k)(1)-(3) .........................................................55

42 U.S.C. § 7410(k)(1)(A) ...........................................................4

42 U.S.C. § 7410(k)(2)-(3) ...........................................................4

42 U.S.C. § 7410(k)(3)..................................................22, 29, 53

42 U.S.C. § 7475(a)(3) ................................................................7

42 U.S.C. § 7607(b)(1)....................................................1, 54, 59, 60

42 U.S.C. § 7607(d)(9) ..............................................................18

**<u>Federal Register</u>**

63 Fed. Reg. 57,356 (October 27, 1998) ....................................37

80 Fed. Reg. 65,292 (Oct. 26, 2015)............................................6

81 Fed. Reg. 15,200 (Mar. 22, 2016) .........................................38

81 Fed. Reg. 74,504 (Oct. 26, 2016) ...........................................8

82 Fed. Reg. 1,733 (Jan. 6, 2017) ......................................7, 9, 38

84 Fed. Reg. 71,854 (Dec. 30, 2019)...................................2, 10, 11

85 Fed. Reg. 12,232 (Mar. 2, 2020)...........................................33

87 Fed. Reg. 9,545 (Feb. 22, 2022) ..................................................11, 12

87 Fed. Reg. 37,235 (June 22, 2022) ............................................12, 13

87 Fed. Reg. 64,412 (Oct. 25, 2022)............................ 13, 14, 32, 43, 46-48, 50, 51

88 Fed. Reg. 9,191 (Feb. 13, 2023) .......................................................13

88 Fed. Reg. 9,336 (Feb. 13, 2023) ..............................................*passim*

88 Fed. Reg. 36,654 (June 5, 2023) .......................................17, 50, 51, 56

**Miscellaneous**

Alabama SIP, EPA-R04-OAR-2021-0841-0026 (June 21, 2022)
[hereinafter "Ala. SIP"] .... 2, 13, 27, 33, 34, 37, 39, 40, 41, 43, 44, 50, 52, 53

Alabama SIP Submittal Part 2, EPA-R04-OAR-2019-0156-0002 (Aug.
20, 2018) .......................................................................................10

Comments of Alabama Power Company, Southern Power Company,
and PowerSouth Energy Cooperative of EPA's Proposed
Disapproval of Alabama's Interstate Transport SIP for the 2015
Ozone NAAQS, EPA-R04-OAR-2021-0841-0034 (Nov. 25,
2022) [hereinafter "Disapproval Comments"] ....................14, 15, 43, 48, 52

EPA, *2015 Ozone NAAQS Preliminary Transport Assessment Design
Values & Contributions*, EPA-HQ-OAR-2016-0751-0007 (Dec.
2016) .......................................................................................10, 45

EPA, *2016v2 Design Values & State Contributions*, EPA-HQ-OAR-
2021-0663-0012 (2016v2)................................................................11, 45

EPA, *2016v3 Design Values & State Contributions*, EPA-HQ-OAR-
2021-0663-0070 (Feb. 2023)................................................................35, 45

EPA, Emissions Trends Database, https://www.epa.gov/air-emissions-
inventories/air-pollutant-emissions-trends-data (State Tier1
CAPS Trends)....................................................................................40

EPA, *Legal Memorandum Application of Significant Impact Levels in the Air Quality Demonstration for PSD Permitting under the Clean Air Act* (April 2018), https://www.epa.gov/sites/default/files/2018-04/documents/legal_memorandum_final_4-17-18.pdf [hereinafter "April 2018 Memorandum"] ...........................................8, 28, 29

EPA, *Ozone Transport Policy Analysis App. A*, EPA-R07-OAR-2021-0851-0016 (Mar. 2023).........................................................................51

EPA, *2015 Ozone NAAQS Interstate Transport SIP Disapprovals—Response to Comment (RTC) Document*, EPA-HQ-OAR-2021-0663-0083 (Feb. 2023) [hereinafter "RTC"]...... 15, 16, 23, 34, 43, 48, 49, 52

EPA, *Updated 2023 Contribution Modeling*, EPA-HQ-OAR-2021-0663-0019 (May. 2018).........................................................................45

Letter from Lance R. LeFleur, Dir., ADEM, to Michael Regan, Admin., EPA Region 4, EPA-R04-OAR-2021-0841-0033 (Nov. 23, 2022) [hereinafter "Ala. Comment Letter"]...........................................14, 15

NOAA, Air Resources Laboratory, *Hysplit*, tinyurl.com/5n6tu983 (last visited Sept. 16, 2023) ..................................................................42

Pet. for Review, *Alabama v. EPA*, Case No. 22-12685 (11th Cir. Aug. 17, 2022) ...........................................................................................12

Tsirigotis, *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport SIP Submissions for the 2015 Ozone NAAQS*, EPA-HQ-OAR-2021-0663-0004 (Aug. 31, 2018) [hereinafter "August 2018 Guidance"]...........................................................8, 9, 25, 27, 32

Tsirigotis, *Guidance on Significant Impact Levels of Ozone and Fine Particles in the PSD Permitting Program* (Apr. 17, 2018), https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf [hereinafter "April 2018 Guidance"] .........................................7, 28

Tsirigotis, *Information on the Interstate Transport SIP Submissions for the 2015 Ozone NAAQS under Clean Air Act Section 110(a)(2)(D)(i)(I)*, EPA-HQ-OAR-2021-0663-0003 (Mar. 27, 2018) [hereinafter "March 2018 Guidance"] ........................4, 7, 9, 28, 38, 46

# JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the U.S. Environmental Protection Agency's ("EPA") final action disapproving Alabama's State Implementation Plan ("SIP") under 42 U.S.C. § 7607(b)(1).  Petitioners timely filed their petitions for review in this Court on April 13, 2023, (Case No. 23-11173, Doc. 1-2) and April 14, 2023, (Case No. 23-11196, Doc. 1-2) within 60 days of the publication of final action in the Federal Register on February 13, 2023.  42 U.S.C. § 7607(b)(1).  This Court is the proper venue for the petitions because the final action is locally or regionally applicable and not based on determinations of nationwide scope or effect.  *Id.*

# STATEMENT OF THE ISSUES

I.      Whether EPA exceeded its statutory authority in disapproving Alabama's reasoned SIP by applying non-statutory policy preferences, in contravention of the cooperative federalism structure of the Clean Air Act ("CAA" or "Act").

II.     Whether EPA unlawfully and arbitrarily and capriciously rejected Alabama's use of a 1 part-per-billion ("ppb") screening threshold to determine whether contributions from the State significantly impacted ozone levels in downwind states, when EPA's own guidance recommended that screening approach.

III.    Whether EPA unlawfully and arbitrarily and capriciously rejected Alabama's reasonable weight-of-evidence analysis because Alabama's analysis deviated from EPA's preferred framework, developed for *federal* implementation plans ("FIPs").

IV.   Whether EPA arbitrarily and capriciously disregarded record evidence demonstrating that emissions in Alabama do not "significantly contribute" to downwind pollution when applying criteria the Supreme Court endorsed in *EPA v. EME Homer City Generation, LP*, 572 U.S. 489, 502-03 (2014).

## STATEMENT OF THE CASE

Petitioners challenge EPA's disapproval of Alabama's SIP addressing the interstate transport requirements of the CAA with respect to the 2015 National Ambient Air Quality Standards ("NAAQS") for ozone.  88 Fed. Reg. 9,336, 9,381 (Feb. 13, 2023).  Alabama determined, based on both a screening analysis and a weight-of-evidence assessment, that the suite of emission limitations and programs already in effect in the state prevent sources of air emissions in Alabama from "significantly contributing" to ozone nonattainment issues in metropolitan Houston. *See* Ala. SIP, EPA-R04-OAR-2021-0841-0026, at 102.  EPA initially agreed, *see* 84 Fed. Reg. 71,854, 71,859 (Dec. 30, 2019), then reversed course and ultimately disapproved Alabama's SIP submission because the State did not adhere to EPA's policy preferences for assessing "significant contribution," 88 Fed. Reg. at 9,354-55.   Petitioners challenge EPA's authority to impose such non-statutory requirements.

## I.     Statutory Background

The CAA establishes a "cooperative-federalism approach to air quality regulation" and "sets out a two-stage process" to protect the Nation's air. *Ala. Env't Council v. EPA*, 711 F.3d 1277, 1280 (11th Cir. 2013) [hereinafter *AEC*] (citations and quotations omitted). The respective roles of EPA and the states in this process are straightforward. First, EPA sets standards for defining healthy air—the NAAQS. *Id.* Then, "states have primary responsibility for ensuring that the ambient air meets the NAAQS" through the development of a section 7410 SIP. *Id.* (citations and quotations omitted); 42 U.S.C. § 7410(a)(1)-(2).

States enjoy "wide discretion" in assembling their SIPs. *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976). "The great flexibility accorded the states [is] illustrated by the sharply contrasting, narrow role to be played by the EPA." *AEC*, 711 F.3d at 1280 (citations and quotations omitted). Indeed, the "fundamental premise" of the Act is that states have "primary responsibility for ensuring" the NAAQS are met after they are set by EPA. *Id.* at 1293. And, "so long as the ultimate effect of a State's choice of emission limitations is [in] compliance with" the requirements of the Act, the state may implement "whatever mix of emission limitations it deems best suited to its particular situation." *Id.* at 1280 (quoting *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)).

As EPA has explained, a state may satisfy its obligation "by demonstrating that the state's [existing] SIP *already*…addresses the necessary provisions, *or* by making a substantive SIP revision to update the plan provisions to meet the new standards." March 2018 Guidance, EPA-HQ-OAR-2021-0663-0003, at 2 (emphases added). In other words, a state may determine that the *existing* "mix of emissions limitations…[is] best suited to its particular situation." *Train*, 421 U.S. at 79.

After states have discharged their duty, EPA must confirm the SIP submission contains "the information necessary…to determine whether the plan submission complies" with the Act. 42 U.S.C. § 7410(k)(1)(A). Once the SIP submission is deemed complete, then "within 12 months" EPA "shall approve such submittal…if it meets all the applicable requirements" of the Act. *Id.* § 7410(k)(2)-(3); *see also AEC*, 711 F.3d at 1280. The Fifth Circuit has described EPA's role at this step as "the ministerial function of reviewing SIPs for consistency with the Act's requirements." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012).

This Court has identified a number of factors which EPA considers in its review of a SIP submission. For example, EPA may consider whether emission controls in a proposed revision to a state plan remain "as stringent as existing law." *AEC*, 711 F.3d at 1283. But, EPA may not disapprove a SIP based on "modeling presented…under a worst-case scenario." *Id.* at 1284 (citation and quotations

4

omitted).  Likewise, where data may be inconclusive, EPA will defer to the state and find a SIP revision "satisfied the requirements of…the Clean Air Act."  *Id.* (cleaned up).  Yet, EPA will not approve a SIP where the record "clearly demonstrate[s]" the SIP will result in increased emissions.  *Id.* at 1285 (citation and quotations omitted).

If a state fails to submit a SIP, or if EPA disapproves the state's SIP, EPA obtains the authority and obligation to issue a FIP for the state.  *See* 42 U.S.C. § 7410(c)(1).  EPA is allotted two years to promulgate a FIP, during which time the state can submit a revised SIP to "correct[] the deficiency."  *Id.*

At issue here are the interstate transport or "good neighbor" portions of Alabama's SIP.  Specifically, the CAA provides that each SIP shall:

> contain <u>adequate provisions prohibiting</u>…any source or other type of <u>emissions</u> activity within the State from emitting any air pollutant in amounts <u>which will contribute significantly to nonattainment in</u>, or interfere with maintenance by, <u>any other State</u> with respect to [the NAAQS.]

42 U.S.C. § 7410(a)(2)(D) (cleaned up; guiding emphases added).  Importantly, the CAA does not define what it means to "contribute significantly."  Nor did Congress establish any "numeric threshold" to measure significant contributions.  *Texas v. EPA*, 983 F.3d 826, 839 (5th Cir. 2020).  Rather, according to the Supreme Court and the "plain text" of the Act, it is an "upwind States[']" "task" to identify the "amounts" of "upwind pollution" "that push a downwind State's pollution

concentrations above the relevant NAAQS." *EME Homer*, 572 U.S. at 509, 514, 514 n.15.

In other words, Congress left it to the states to determine in the first instance whether their SIPs are adequate to prevent emissions from contributing significantly to downwind nonattainment. *See City of Seabrook v. EPA*, 659 F.2d 1349, 1356 (5th Cir. 1981) (giving states the policymaking role under the CAA); *see also Union Elec.*, 427 U.S. at 269. And EPA has agreed that states "determine" significance. 88 Fed. Reg. at 9,371 ("EPA expects states to further evaluate their emissions *to determine* whether their emissions constitute significant contribution[.]") (emphasis added).

## II.     Factual Background

### A.     2015 Ozone NAAQS

In 2015, EPA lowered the ozone NAAQS from 75 ppb to 70 ppb. 80 Fed. Reg. 65,292, 65,293-94 (Oct. 26, 2015). Ozone is formed when "precursor" emissions of nitrogen oxides ("$NO_X$"), which can travel across state boundaries, mix with other pollutants in the air and sunlight. EPA has not promulgated regulations for states to follow related to the good neighbor obligation for the revised NAAQS. Instead, it released a variety of guidance memoranda and two sets of initial modeling data.

The initial modeling data EPA compiled in December 2016 was expressly "intended to help inform state efforts to address interstate transport," and EPA explained "states may rely on this or other appropriate modeling, data or analyses to develop approvable Good Neighbor SIPs." 82 Fed. Reg. 1,733, 1,735 (Jan. 6, 2017). EPA then updated its transport modeling in March 2018. *See* March 2018 Guidance at App. B, C.

EPA provided guidance and "information to the states" in March 2018 regarding its modeling data. In addition to notes on EPA's modeling, this guidance identified the "PSD program" as relevant for identifying significant contributions under the good neighbor provision. *See id.* at A-2 (stating that "establishing a contribution threshold" could "leverage some of the analytics and statistical data created" for the PSD program). Just like the good neighbor provision, the PSD program is a CAA provision that regulates emissions to ensure the NAAQS are maintained. Additional guidance from EPA explained that, under the PSD program, EPA has interpreted the statutory phrase "*contribute…in excess of*" the 2015 ozone NAAQS, 42 U.S.C. § 7475(a)(3), to exclude contributions less than 1 ppb as *de minimis*. *Guidance on Significant Impact Levels in the PSD Permitting Program* at 7, 15 tbl. 1 ["April 2018 Guidance"]. The PSD provision does not include the modifier "significant," and EPA has recognized that, in light of this, it is appropriate to assume that "significant contribution" is a higher threshold than a simple

"contribution." *See Legal Memorandum of Significant Impact Levels in PSD Permitting* at 9 n.6 ["April 2018 Memorandum"].

In August 2018, EPA issued further guidance recommending screening thresholds for states to use in determining whether their emissions "contribute significantly" to downwind nonattainment. August 2018 Guidance, EPA-HQ-OAR-2021-0663-0004, at 2. EPA evaluated a range of possible screening thresholds, from 0.7 ppb to 2 ppb of ozone, and stated that either 1 ppb or, alternatively, 0.7 ppb of ozone (*i.e.*, 1% of the NAAQS) could be "reasonable and appropriate" for states to use in developing their SIPs. *Id.* at 4. Contributions below these thresholds would automatically be considered "insignificant" and require no further analysis.

EPA also noted in its guidance that the Agency had previously developed its own *federal* framework for addressing the Good Neighbor provision. This 4-step framework had been used by EPA in prior *FIPs* to address certain states' good neighbor obligation (when those states had not themselves submitted an approvable good neighbor SIP). *See, e.g.*, 81 Fed. Reg. 74,504 (Oct. 26, 2016). In this framework, Step 1 identifies air quality trouble-spots. Step 2 identifies which states' emissions contribute to those trouble-spots above a certain screening threshold. Step 3 assesses whether any cost-effective reductions of $NO_X$ emissions are available from those states. Together, Steps 1-3 identify any "significant contribution" from

upwind states. Step 4 then identifies the regulatory measures needed to eliminate these "significant contributions." *See* 88 Fed. Reg. at 9,339.

Importantly, simply because Step 2 may identify a contribution to a downwind state, that "does not determine whether the state significantly contributes" to downwind air quality issues. 82 Fed. Reg. at 1,740. Instead, EPA would perform additional analysis, which is the crux of Step 3. At that step, EPA assesses whether cost-effective reductions in $NO_X$ emissions could be achieved and defines "significant contribution" according to that amount. Thus, emissions that might contribute to downwind air quality issues are not, by EPA's own definition, "significant" if those emission cannot be reduced cost-effectively. *See EME Homer*, 572 U.S. at 502-03.

Despite EPA's preference for its own 4-step framework, it acknowledged states need not use that framework. Specifically, EPA's March 2018 guidance endorsed "potential flexibilities" in analytical approaches, noting that states could use the "four-step transport framework," "*somewhat different analytical approaches* within these steps," "or *alternative frameworks*." March 2018 Guidance at 3 (emphases added). EPA also clarified states "*may supplement* the information provided in this memorandum with any additional information that *they believe* is relevant to addressing the good neighbor provision requirements." *Id*. at 6 (emphases added).

**B.     Alabama's 2018 Interstate Transport SIP for the 2015 Ozone NAAQS**

In August 2018, Alabama timely submitted a SIP to EPA Region 4 addressing the good neighbor provision for the 2015 ozone standard. 84 Fed. Reg. at 71,859. Alabama determined sources in Alabama would not contribute significantly to ozone issues in downwind states. *Id.* Alabama's conclusion was not controversial. Both of the December 2016 and March 2018 modeling results showed all contributions from Alabama to downwind nonattainment and maintenance areas were well below <u>both</u> of the recommended screening thresholds of 0.7 ppb and 1 ppb. *See* EPA, *2015 Ozone NAAQS Preliminary Transport Assessment Design Values & Contributions*, EPA-HQ-OAR-2016-0751-0007 (Dec. 2016); Ala. SIP Submittal Part 2, EPA-R04-OAR-2019-0156-0002, at 2 (Aug. 20, 2018). Alabama's SIP submittal also explained that numerous existing programs and requirements regulating $NO_X$ and other ozone precursors from Alabama sources have led to reductions in emissions and would remain in force, so continued reductions were expected. Ala. SIP Submittal Part 2, at 1-2.

EPA was required to approve or disapprove Alabama's SIP by February 2020. Initially, in December 2019, EPA Region 4 proposed to *approve* Alabama's SIP submittal, stating: "Alabama's largest impact on any potential downwind nonattainment and maintenance receptor…are 0.37 ppb and 0.49 ppb, respectively. These values are less than 0.70 ppb…[a]ccordingly…[Alabama] will not

significantly contribute to nonattainment…in any other state." 84 Fed. Reg. at 71,859.

EPA never finalized the proposed approval, failing to meet its statutory deadline. In February 2022, Region 4 reversed course and proposed to withdraw its 2019 proposed approval and instead disapprove Alabama's 2018 submittal. 87 Fed. Reg. 9,545 (Feb. 22, 2022). Region 4 explained that new model outputs, EPA's "2016v2" modeling run,[1] generated well after EPA had found Alabama's SIP submittal complete, suggested emissions from Alabama could have a slightly smaller effect in some places and a slightly larger effect in others. *Id.* at 9,553; *see also 2016v2 Design Values & State Contributions*, EPA-HQ-OAR-2021-0663-0012. Specifically, despite reductions in $NO_X$ emissions from Alabama between the prior model runs and the 2016v2 run, EPA's new modeling file showed downwind impacts from Alabama of 0.71 ppb and 0.88 ppb at receptors in Dallas (Denton County) and Houston (Harris County), respectively. *Id.* tbl. 1.

These modeled impacts were still small—both less than 1 ppb—but Region 4 proposed disapproval because they exceeded the more stringent of EPA's "reasonable and appropriate" screening thresholds (*i.e.*, 0.7 ppb). 87 Fed. Reg. at

---

[1] EPA uses the same model, CAMx, for all the modeling runs. The difference among the modeling iterations consists principally of changes to emissions inventories and meteorology.

9,550.  Region 4 noted that, given none of the modeling available when Alabama submitted its SIP indicated Alabama contributed above 0.7 ppb of the NAAQS, "Alabama may not have considered analyzing…a 1 ppb threshold[.]"  *Id.* at 9,553.  Nonetheless, Region 4 proposed disapproval based on the "newly available information."  *Id.* at 9,554.

### C.  Alabama's 2022 Interstate Transport SIP for the 2015 Ozone NAAQS

Given the consequential changes in EPA's new modeling runs and EPA's recognition that a 1 ppb screening threshold would make a substantive difference, Alabama elected to withdraw its 2018 SIP and simultaneously submit a replacement SIP in an effort to address EPA's post-review modeling.  Alabama submitted its replacement SIP on April 21, 2022, but EPA identified minor administrative deficiencies and found the replacement SIP technically "incomplete."  *See* 87 Fed. Reg. 37,235 (June 22, 2022).  Alabama promptly corrected its paperwork and submitted the corrections on June 21, 2022.  Nonetheless, the very next day, Region 4 published a "Direct Final Rule" finding Alabama had failed to submit a timely SIP revision.  *Id.*  Region 4 explained this action gave it authority to "promulgate a FIP for Alabama."  *Id.* at 37,236.

The Direct Final Rule was challenged in this Court by Petitioners.  Pet. for Review, *Alabama v. EPA*, No. 22-12685 (11th Cir. Aug. 17, 2022).  The Direct Final Rule itself stated petitions for review "must be filed in the United States Court of

12

Appeals for the appropriate circuit [*i.e.*, the Eleventh Circuit]." 87 Fed. Reg. at 37,237. The case was ultimately dismissed after EPA rescinded its Direct Final Rule on February 13, 2023, in an action signed by the Region 4 Administrator. 88 Fed. Reg. 9,191, 9,191-94 (Feb. 13, 2023). The rescission also stated challenges to that action would be proper in this Court. *Id.* at 9,194.

In the June 2022 replacement SIP submittal, Alabama expressly adopted a 1 ppb screening threshold. *See* Ala. SIP at 102. The Alabama SIP submittal explained the basis for adopting that reasonable alternative, including an assessment of the factors recommended by EPA. Ala. SIP at 83-86, 105-06. Alabama also performed a weight-of-evidence analysis, which considered EPA's 2016v2 modeling, meteorological information, emissions data, model performance, and screening thresholds. *Id.* at 104-106. Ultimately, Alabama concluded its sources did not "significantly contribute" to any potential downwind issues with respect to the 2015 ozone NAAQS. *Id.* at 106.

### D. Region 4's Proposed Disapproval

Despite Alabama's express adoption of a 1 ppb screening threshold, Region 4 once again proposed to disapprove Alabama's SIP. 87 Fed. Reg. 64,412 (Oct. 25, 2022). And although Alabama presented a weight-of-evidence analysis rather than use EPA's 4-step framework, Region 4 nonetheless evaluated Alabama's submittal against each of the steps in EPA's 4-step framework. *Id.* at 64,420-21. Further,

Region 4 explained that any deviation from its 4-step framework "must be substantially justified." *Id.* at 64,415.

With respect to the contribution screening threshold, Region 4 determined that "the attempted use of [the 1 ppb] threshold[]…raises substantial policy consistency and practical implementation concerns." *Id.* at 64,418. EPA also found that Alabama did not "sufficiently justify" use of an "alternative" 1 ppb threshold and claimed that Alabama did "not argue in its submittal that [0.7 ppb] would *not* be an appropriate threshold for upwind contributions to the Texas receptors." *Id.* at 64,423. And "EPA view[ed] the [0.7 ppb] threshold as the *more appropriate* threshold[.]" *Id.* at 64,424 (emphasis added). Further, EPA explained that, "[w]hile EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner EPA has done," "states must complete something similar to EPA's analysis[.]'" *Id.* at 64,425. Therefore, EPA faulted Alabama for not including such a "similar" analysis in its submittal. *Id.* Ultimately, EPA did not find that Alabama's analyses or conclusions were unreasoned or unreasonable, but, because Alabama's analysis departed from EPA's preferred 4-step framework, Region 4 proposed to find that Alabama's SIP did "not meet the State's interstate transport obligations." *Id.* at 64,426.

Petitioners provided comments addressing the concerns identified by EPA in its proposed disapproval. *See generally* Disapproval Comments, EPA-R04-OAR-2021-0841-0034; Ala. Comment Letter, EPA-R04-OAR-2021-0841-0033. Included

in these comments are additional technical discussions on Alabama's 1 ppb screening threshold, trends in decreasing $NO_X$ emissions from Alabama, further meteorological analyses, additional information on linkages, data and explanation of emission reductions and controls from Alabama electric generating units ("EGUs"), as well as discussion of EPA's modeling. *See id.*

### E. EPA's Final Disapproval

On February 13, 2023, EPA published its final disapproval of Alabama's SIP based on even further revised modeling results, the "2016v3 modeling." 88 Fed. Reg. at 9,354. EPA's Alabama disapproval was published in a consolidated notice that included actions on twenty other states' SIPs. EPA explained in its notice that each action was judged "in light of the facts and circumstances of each particular state's submission" and that "the contents of each individual state's submission were evaluated on their own merits." *Id*. at 9,340, 54.

In issuing its final disapprovals, EPA made clear that it "does not…agree… [that] the EPA's role in the state-Federal relationship [is] 'secondary' such that the EPA must defer to state choices." *Id*. at 9,367. Rather, according to EPA, "such deference" would be "inappropriate in the context of addressing interstate pollution." *Id.* EPA claimed that the Supreme Court's ruling in *EME Homer* "directly affirms the critical role the EPA plays" in implementing the good neighbor provision. RTC, EPA-HQ-OAR-2021-0663-0083, at 426. However, that case

concerned *federal* implementation plans, and the Court confirmed "[n]othing in the Act differentiates the Good Neighbor Provision from the several other matters a State must address in its SIP." *EME Homer*, 572 U.S. at 509.

Given EPA's view of its role in the SIP process, EPA again asserted that deviation from EPA's 4-step framework "must be *substantially justified*." 88 Fed. Reg. at 9,340 (emphasis added). With respect to screening thresholds, EPA found that "application of a consistent contribution threshold is *necessary*" and found "the use of an alternative threshold *problematic*." *Id.* at 9,342 (emphases added). But, EPA did not "formally rescind[]" its prior guidance endorsing a 1 ppb threshold. *Id.* at 9,373.

Accordingly, EPA explained that Alabama was projected to be linked above EPA's preferred contribution threshold of 0.7 ppb at one nonattainment receptor ("0.75 ppb to Galveston County, Texas"), which is part of the Houston nonattainment area. *Id.* at 9,354. Despite a single modeled contribution just 0.05 ppb above *EPA's* chosen screening threshold, EPA "disagree[d] with Alabama's arguments for application of a higher contribution threshold…at Step 2." *Id.*

Further, EPA found that although Alabama conducted its own weight-of-evidence analysis, "[t]he State did not conduct an adequate Step 3 analysis." *Id.* And, although EPA explained that it "does consider additional factors beyond whether the state is linked at step 2," RTC at 186, EPA deemed "the evaluation of

additional emissions control opportunities" insufficient to support Alabama's conclusion that "it had already implemented all cost-effective controls," 88 Fed. Reg. at 9,354. Ultimately, EPA finalized its disapproval of Alabama's SIP. *Id.* at 9,355. As a result, EPA subsequently published a FIP for Alabama on June 5, 2023. 88 Fed. Reg. 36,654.

### F.    Procedural History

The State of Alabama and the Alabama Department of Environmental Management timely petitioned this Court to review EPA's disapproval of Alabama's SIP on April 13, 2023, and Alabama Power Company and PowerSouth Energy Cooperative filed a similar petition for review the next day. These cases were consolidated. Doc. 24 (July 12, 2023).[2]

On April 28, 2023, the Court issued a jurisdictional question to the parties, requesting clarification of the proper forum for the petitions for review. Doc. 9. Petitioners filed a response on May 12, 2023, affirming that the Eleventh Circuit is the proper venue. Doc. 13. On July 12, 2023, the Court issued an order carrying the jurisdictional question with the case. Doc. 24.

Meanwhile, on June 13, 2023, Petitioners filed a motion to stay the effectiveness of EPA's disapproval of Alabama's SIP, given Petitioners' likelihood

---

[2] All citations refer to documents in the docket for Case No. 23-11173.

of success on the merits and the harm EPA's action would impose on Alabama, its citizens, and regulated entities.  Doc. 18.  On August 17, 2023, this Court granted Petitioners' motion to stay.  Doc. 33.

## III.  Standard of Review

Under the CAA, "a final action will be set aside if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'; [or] exceeds the agency's statutory authority[.]"  *AEC*, 711 F.3d at 1285 (quoting 5 U.S.C. § 706(2)(A), (C), & (D)); *see also* 42 U.S.C. § 7607(d)(9).  An agency action is not entitled to deference when it exceeds its statutory authority.  *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).

An action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency[.]"  *Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) [hereinafter *State Farm*].  While courts must "refrain[] from substituting its own judgment for that of the agency," the court must take a "hard look" "beyond the scope of the decision itself to the relevant factors that the agency considered."  *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002).

Courts decide venue under 42 U.S.C. § 7607(b)(1) *de novo*, without deference to EPA's arguments or determinations. *See Texas v. EPA*, 829 F.3d 405, 421 (5th Cir. 2016). This *de novo* review includes whether the action is "locally or regionally applicable"; and, if the action is locally applicable, whether (1) the action is actually based on a determination of nationwide scope or effect and (2) EPA has made an adequate finding thereof. *Id.* at 419-21; *see RMS of Georgia, LLC v. EPA*, 64 F.4th 1368, 1372 (11th Cir. 2023) [hereinafter *RMS*].

## SUMMARY OF THE ARGUMENT

EPA's disapproval of Alabama's SIP is both an unlawful exceedance of its authority under the CAA and arbitrary and capricious. Under the cooperative federalism framework of the Act, Congress assigned states the primary role in developing their SIPs, and EPA must approve a state's SIP as long as it reasonably satisfies the Act's requirements. *See* 42 U.S.C. § 7410(a)(3); *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 490 (2004) [hereinafter *Alaska*]; *AEC*, 711 F.3d at 1280. Here, EPA disregarded its mandate under the CAA and imposed upon Alabama its own extra-statutory policy preferences. In so doing, EPA disregarded its own guidance and ignored compelling evidence that Alabama does not significantly contribute to downwind attainment of ozone standards in metropolitan Houston.

*First*, EPA usurped Alabama's statutory role by dismissing Alabama's use of a 1 ppb screening threshold. Because Alabama's adoption of a 1 ppb screening threshold was "reasonably moored to the Act's" requirements, *Alaska*, 540 U.S. at 485, EPA had no authority to substitute EPA's now-preferred 0.7 ppb screening level. Not only did EPA overstep its authority, EPA capriciously set aside its own guidance and instituted a *post hoc* substantial justification standard in order to reject Alabama's reasonable screening threshold. In fact, once Alabama adopted EPA's alternative screening threshold of 1 ppb, EPA's analysis should have ended immediately, leading to an approval of Alabama's SIP.

*Second*, EPA unlawfully rejected Alabama's weight-of-evidence analysis by insisting that any deviation from the Agency's preferred, non-statutory framework must be "substantially justified." 88 Fed. Reg. at 9,340. Thus, while Alabama's SIP demonstrated that, due to meteorological analysis, declining and well-controlled emissions, EPA's own modeling results, and an existing suite of regulations, Alabama's emissions do not significantly contribute to downwind nonattainment in Texas, EPA ignored its role under the CAA, stepped into the shoes of the state, and unlawfully disapproved Alabama's SIP.

*Third*, even under EPA's own methodology, Alabama's SIP should have been approved. Undisputed record evidence demonstrates emissions in Alabama cannot

be cost-effectively reduced further.  *See EME Homer*, 572 U.S. at 502-03.  EPA's rejection of Alabama's reasonable analysis was arbitrary and capricious.

*Finally,* review is only available in this Court because the relevant action at issue is EPA's disapproval of Alabama's section 7410 SIP, which, by law, is locally applicable and was not based on a determination of nationwide scope or effect.

## ARGUMENT

### I.    EPA's Action Unlawfully Exceeded Its Statutory Authority

This Court should vacate EPA's disapproval of Alabama's SIP because EPA exceeded its statutory authority and blatantly ignored the cooperative federalism structure of the CAA.  EPA's misapprehension of its statutory role infected every aspect of its review and is fatal to EPA's disapproval.

EPA and the states' respective roles under the CAA are well established.  EPA sets the NAAQS and states bear the "primary responsibility for ensuring that the ambient air meets the NAAQS[.]"  *AEC*, 711 F.3d at 1280.  Because "prevention and control of air pollution at its source is the ***primary responsibility*** of States and local governments," EPA is "relegated by the Act to a secondary role" in this process.  *Train*, 421 U.S. at 64, 79.  The CAA gives EPA "no authority to question the wisdom of a State's choices," *id.*, so long as the states' plan is "consistent with the Act," *City of Seabrook*, 659 F.2d at 1357.  *See also Luminant*, 675 F.3d at 926

(the CAA "leaves the [EPA] no discretion to do anything other than ensure that a state's submission meets the [Act's] requirements").

Courts have confirmed the states' primary role and discretion in crafting and implementing SIPs. *See, e.g.*, *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981) (the "great flexibility accorded the states" is "sharply contrast[ed]" by the "narrow role to be played by EPA"); *Luminant*, 675 F.3d at 928 n.8 ("[o]nly the states enjoy discretion in implementing the dictates of the CAA"); *North Dakota v. EPA*, 730 F.3d 750, 760-61 (8th Cir. 2013) ("the CAA grants states the primary role of determining the appropriate pollution controls"); *Wyoming v. EPA*, No. 14-9529, slip op. at 13 (10th Cir. Aug. 15, 2023) ("The EPA has less discretion when it rejects a SIP than it does when it promulgates a FIP...the initial responsibility falls to the states." (citations and quotations omitted)).

This is not to say EPA plays no role at all; but, EPA is restricted to reviewing the state's submission "as a whole," 42 U.S.C. § 7410(k)(3), for "'substantial[] compl[iance]' with the statute," *City of Seabrook*, 659 F.2d at 1356. While this review is not a "rubberstamp," *Wyoming*, slip op. at 17, EPA is limited to determining whether the SIP submission "meet[s] the minimum criteria of the Act," 88 Fed. Reg. at 9,380. Thus, EPA must respect the judgments of the state and, where the state has put forward a "reasoned analysis," *Alaska*, 540 U.S. at 490, EPA must respect that choice.

EPA ignored these guardrails. Instead of assessing Alabama's reasoned analysis for consistency with the Act, EPA disapproved Alabama's SIP based on its own preference for a "uniform" "nationwide policy." 88 Fed. Reg. at 9,380. But EPA's policy preferences are not a legal basis for disapproving a state's SIP. *See AEC*, 711 F.3d at 1280 ("If the SIP…meets the requirements in the Clean Air Act, the EPA must approve it."); *cf. Sierra Club v. Ga. Power Co.*, 443 F.3d 1346, 1354 (11th Cir. 2006) (noting EPA policy preferences cannot automatically dislodge a state's SIP authority). And Congress's choice to grant each state primary authority to craft its individual SIP directly overrules EPA's desire for "uniformity."

Specifically, EPA unlawfully imposed each element of its 4-step framework, developed for *federal* implementation plans, on Alabama. *See* 88 Fed. Reg. at 9,338 & n.9. If a state did not observe EPA's 4-step method in lockstep, EPA required "substantial[] justif[ication]" to deviate therefrom. *Id.* at 9,340. This is inconsistent with cooperative federalism and with EPA's own assessment that EPA has authority to reject a SIP where emission controls will not remain "as stringent as existing law" or where the record "clearly demonstrates" some inconsistency with the Act. *AEC*, 711 F.3d at 1283, 1285 (citations and quotations omitted).

EPA attempts to leverage the Supreme Court's 2014 opinion in *EME Homer* to require Alabama to substantially justify any departure from EPA's prior 4-step approach. *See, e.g.,* RTC at 431. But *EME Homer* concerned EPA's *FIP* authority,

23

572 U.S. at 507 (clarifying the "gravamen" of the case "*is not*…EPA's disapproval of any particular SIP" (emphasis added)), while an unlawful SIP disapproval *is* the issue here. The Supreme Court explained that even if the state's "task" of "calculating their own significant contribution" involves "practical difficulties," there is no reason to "depart[] from the Act's plain text." *Id.* at 514 n.15, 504, 509. And, the state is not to wait for EPA to "quantif[y] an upwind State's good neighbor obligation[]" for it. *Id.* at 509. Moreover, the Court added that "[n]othing in the Act differentiates the Good Neighbor Provision from the several other matters a State must address in its SIP," *id.*, meaning there is nothing inherent about the good neighbor provision that would authorize EPA to supplant the state's primary role.

In contrast, Alabama's reasoned and reasonable assessment (including, for example, examining "modeling presented…under a worst case scenario" and making reasonable judgments when data is inconclusive, *AEC*, 711 F.3d at 1284 (citations and quotations omitted)), falls squarely within the authority granted to it by the CAA. And, fatally, EPA never concluded that Alabama's SIP was either unreasoned or unmoored from the Act. *See Alaska*, 540 U.S. at 490; *North Dakota*, 730 F.3d at 766; *Wyoming*, slip op. at 20 (EPA "must explain why [the State's] analyses are beyond the range of reasonableness afforded to the state by the [CAA]."). EPA only found Alabama had not satisfied EPA's desire for substantial justification. *See* 88 Fed. Reg. 9,355.

EPA's disapproval "reflects a misapprehension by the EPA of its authorized role in the SIP-approval process," *Luminant*, 675 F.3d at 928 n.8, which manifests most directly in the Agency's rejection of Alabama's chosen screening threshold and weight-of-evidence analysis, as discussed below. For this reason, the disapproval must be vacated. *See Jama v. Immigr. and Customs Enf't,* 543 U.S. 335 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply[.]"); *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (agency action "may not stand if the agency has misconceived the law"); *Prill v. NLRB*, 755 F.2d 941, 947 (D.C. Cir. 1985) ("An agency decision cannot be sustained, however, where it is based…on an erroneous view of the law.").

## II.    EPA Unlawfully Rejected Alabama's Reasonable Screening Threshold

Alabama's obligation and authority under the CAA's good neighbor provision was to determine whether its existing suite of air emission regulations adequately prevents sources in Alabama from "contribut[ing] significantly" to downwind nonattainment. 42 U.S.C. § 7410(a)(2)(D). Importantly, the Act does not define what it means to "contribute significantly." Nor did Congress establish any "numeric threshold" to measure significant contributions. *See id.*; *see also Texas*, 983 F.3d at 839. Even EPA recognized that there are multiple reasonable ways to interpret "contribute significantly." August 2018 Guidance at 2.

To determine whether the State made any significant contributions of ozone to other states, Alabama applied a 1 ppb screening threshold to the results of EPA's modeling of downwind ozone contributions. Because EPA's modeling ultimately identified *only one* downwind contribution from Alabama of 0.75 ppb, 88 Fed. Reg. at 9,353, Alabama's reasonable choice of a 1 ppb screening threshold is determinative, such that Alabama's SIP should have been approved. EPA's rejection of Alabama's reasonable choice of screening threshold both exceeds its statutory authority and is arbitrary and capricious.

### A. EPA unlawfully substituted its own screening threshold for Alabama's reasonable 1 ppb threshold.

#### 1. EPA overstepped its statutory role when it disapproved Alabama's reasonable choice of a 1 ppb threshold.

Congress left it to the states to determine in the first instance whether their state plans are adequate to prevent emissions from contributing significantly to downwind nonattainment. *See City of Seabrook*, 659 F.2d at 1356 (giving states the policymaking role under the CAA). And drawing the line for a reasonable screening threshold is well within this primary authority. *See Union Elec.*, 427 U.S. at 269 (describing SIPs as "State's *legislative choices* in regulating air pollution" (emphasis added)), *and Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976) ("[T]he drawing of lines that create distinctions," such as screening contributions, "is peculiarly a *legislative task*." (emphasis added)). Even EPA has agreed that states "determine"

significance.  88 Fed. Reg. at 9,371 ("EPA expects states to further evaluate their emissions *to determine* whether their emissions constitute significant contribution[.]" (emphasis added)).

Accordingly, consistent with its role under the CAA, Alabama adopted a 1 ppb screening threshold to aid in assessing whether any modeled contribution to downwind receptors could be "significant."  Ala. SIP at 105-06.  Importantly, Alabama did not choose this threshold in a vacuum—quite the contrary, it reasonably considered EPA's analysis and EPA's express guidance regarding screening thresholds. *See id.*

Specifically, EPA's August 2018 guidance, issued expressly to aid states' good neighbor analyses, found that, "[b]ecause the amount of upwind collective contribution captured with the 1 percent [*i.e.*, 0.7 ppb] and 1 ppb thresholds is generally comparable…it may be reasonable and appropriate for states to use a 1 ppb contribution threshold."  August 2018 Guidance at 4.   In the guidance, EPA also agreed that states could "consider whether the recommendations in this guidance are appropriate for each situation."  *Id.* at 1.  Alabama relied on this guidance when it adopted a 1 ppb threshold in its SIP submittal.  Ala. SIP at 106. EPA has not rescinded this guidance, 88 Fed. Reg. at 9,342, which means Alabama's use of a 1 ppb threshold was plainly "reasoned" and "consisten[t] with the Act's requirements."  *Alaska*, 540 U.S. at 490; *Luminant*, 675 F.3d at 921.

Alabama's SIP submittal also referenced EPA's March 2018 guidance, which identifies the CAA's PSD program as relevant for determining screening thresholds under the good neighbor provision. *See* March 2018 Guidance at A-2. In the PSD program, which ensures maintenance of the NAAQS inside the state, EPA interprets the statutory term "contribute" to mean *more than* 1 ppb. April 2018 Guidance at 15 tbl.1. It is, therefore, consistent with the Act for Alabama to interpret "contribute *significantly*," in the context of assessing Alabama's influence on the same NAAQS, to mean *at least* more than 1 ppb. For EPA to now claim that the statute demands Alabama set a *lower* screening threshold would upend Congress's use of "significantly" in § 7410(a)(2)(D)(i)(I). *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019) (explaining that statutory terms should "bear[] a consistent meaning throughout"); *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (statutory interpretation should ensure "no part will be … superfluous" (citations and quotations omitted)).

EPA itself has identified a strong textual basis to interpret "contribute significantly" in the good neighbor provision as requiring a *higher* threshold than what is required to merely "contribute." April 2018 Memorandum at 9 n.6. In its April 2018 memorandum, EPA contrasted the PSD term "contribute" with "significantly contribute" and noted that when *other* provisions of the Act reference "significant contributions"—like the good neighbor provision—"EPA should

28

endeavor to read the Act in a way that gives meaning to this modifying language," which may "call for [requiring] a higher degree of contribution" than under the PSD provision. *Id.* Therefore, Alabama's 1 ppb screening threshold for determining *significant* contributions is, at the very least, reasonable and consistent with the CAA given EPA's own application of the same screening threshold for the more inclusive statutory term "contribute."

Considering EPA must approve a reasonable SIP, EPA's decision to substitute its preference for a 0.7 ppb threshold was unlawful. Because Alabama's choice of a 1 ppb threshold was reasoned and meets the requirements of the CAA, EPA "must approve it." *See* 42 U.S.C. § 7410(k)(3); *AEC*, 711 F.3d at 1280.

### 2. EPA arbitrarily and capriciously disregarded its prior guidance affirming a 1 ppb screening threshold.

EPA's rejection of the 1 ppb screening threshold is also arbitrary and capricious because (1) it is a volte-face from the position EPA laid out in its guidance, and (2) EPA never rescinded that guidance. 88 Fed. Reg. 9,373 ("EPA is not formally rescinding...[and] not formally revoking the August 2018 memorandum"); *see New York v. EPA*, 964 F.3d 1214, 1224 (D.C. Cir. 2020) (A "constantly moving target…falls far short of reasoned decisionmaking.").

As set out above, EPA previously found a 1 ppb threshold to be appropriate, and Alabama reasonably relied on EPA's guidance in that respect. Courts have found that, while guidance may not be legally binding, agencies act arbitrarily when

they depart from prior guidance without reason, especially when that guidance has been relied upon. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 217 (2016) (reliance on opinion letters and field operations manuals); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 512, 517, 521 (2009) (reliance on staff rulings and FCC dicta). EPA's decision to reject Alabama's reliance on its guidance was, therefore, arbitrary and capricious.

**B.    EPA unlawfully imposed extra-statutory requirements in order to reject Alabama's 1 ppb threshold.**

EPA argues that Alabama did not "substantially justif[y]" the use of a 1 ppb threshold, 88 Fed. Reg. at 9,340, but EPA's position is unlawful because EPA has no basis under the CAA to require a heightened standard of justification. To the contrary, a SIP must only "substantially comply" with the statute. *City of Seabrook*, 659 F.2d at 1356. Even so, Alabama adequately justified its use of a 1 ppb threshold by analyzing factors originally propounded by EPA, which EPA arbitrarily and capriciously dismissed.

**1.    EPA exceeded its statutory authority when it required Alabama provide additional justification for its 1 ppb threshold.**

In its disapproval action, EPA unlawfully requires "technical justification," along with a "compelling policy reason" for any state to use a 1 ppb threshold. 88 Fed. Reg. at 9,373-74. EPA does so because it insists that "national ozone transport *policy*" demands conformance to its 0.7 ppb screening threshold. *Id.* at 9,373

30

(emphasis added).  EPA defends this view by claiming the good neighbor provision requires "a unique degree of concern for consistency, parity, and equity across state lines," *id.* at 9,373-74, but, under the CAA, EPA is limited to approving states' reasonable choices for their good neighbor SIPs.  *See EME Homer*, 572 U.S. at 514 & n.15 (explaining "the Good Neighbor Provision is initially directed to upwind States," and "EPA's task" is to step in "only after a State has failed to propose a SIP adequate for compliance").  And the CAA does not differentiate the good neighbor provision from the other matters states must address in their SIPs.  *See id.* at 491.

As explained above, EPA's role in the SIP process is secondary; "a fundamental premise underlying the Clean Air Act scheme…is that the states have the primary responsibility for ensuring that the NAAQS are met." *AEC*, 711 F.3d at 1293 (citation and quotations omitted).  It is, therefore, beyond the authority granted to EPA to reject Alabama's chosen threshold by applying a standard of "compelling" or "substantial" justification.  88 Fed. Reg. at 9,374, 9,340; *see also Georgia Dep't of Educ. v. U.S. Dep't of Educ.*, 883 F.3d 1311, 1314 (11th Cir. 2018) ("Agency actions are arbitrary and capricious when the agency has relied on factors which Congress has not intended it to consider[.]" (citations and quotations omitted)); *see also Michigan v. EPA*, 213 F.3d 663, 683-84 (D.C. Cir. 2000) (EPA may not "simply throw[] the burden of persuasion onto the states").

Nonetheless, EPA attempts to validate its preference for a "national[ly] consisten[t]" approach by reimagining its August 2018 guidance as requiring further "state-specific" justification of a 1 ppb threshold. 88 Fed. Reg. at 9,371-73. But the August guidance does not instruct states to further justify the use of a 1 ppb threshold, nor does it require any "state-specific arguments." *Id.* at 9,373. Worse, EPA would also "throw the burden" onto Alabama, *Michigan*, 213 F.3d at 683, to explain why *EPA's* preferred threshold "would *not* be an appropriate threshold," 87 Fed. Reg. at 64,423. But that heightened standard was invented when EPA disapproved Alabama's SIP, whereas EPA's guidance already assessed that, unlike 2 ppb, 1 ppb was comparable to a 0.7 ppb threshold and, therefore, "may be reasonable." August 2018 Guidance at 4.

While boilerplate language in EPA's guidance preserves the possibility that the 1 ppb threshold might not be appropriate in all cases (as is typical for guidance memoranda)—this does not impose a heightened standard. *See id.* at 1. Rather, the guidance itself justifies *and recommends* use of a 1 ppb threshold. *See id.* at 1, 4. If states were to depart from the guidance and, for example, select a 2 ppb threshold, it follows that they may need to offer state-specific reasons for doing so; but it is illogical for EPA to issue guidance with a recommendation and then require states to justify following it.

### 2. EPA arbitrarily and capriciously dismissed Alabama's justification of its 1 ppb threshold.

Having invented extra-statutory hurdles for Alabama to jump in order to use a 1 ppb threshold, EPA then arbitrarily and capriciously ignored the very "reasoned analysis" provided in Alabama's SIP submission in support of that threshold. *Alaska*, 540 U.S. at 490. While Alabama had no obligation to provide a more exhaustive justification for a 1 ppb threshold than the one it offered in reliance on EPA's guidance, it did; and there is no question Alabama's SIP submission is adequately justified and reasonable.

Specifically, Alabama's SIP submission assesses the 1 ppb screening threshold using the identical criteria that EPA itself applied when it proposed to approve Iowa's use of a 1 ppb threshold for the same NAAQS. Ala. SIP at 83-86; *see* 85 Fed. Reg. 12,232, 12,235 (Mar. 2, 2020). In determining that a 1 ppb threshold was acceptable for Iowa, EPA evaluated three factors: (1) the impact of in-state emissions on ozone levels at the receptor compared to collective upwind impacts; (2) the impacts of individual upwind states linked at 1 ppb or higher to the receptor; and (3) whether individual upwind states impacting the receptor between 0.7 and 1 ppb were linked above 1 ppb to other receptors. *Id.* at 12,238.

Alabama's SIP submission includes analysis of these same factors. For example, as to Harris County, under the first factor "upwind states collectively contribute 17%...compared to 40% from in-state emissions." Ala. SIP at 85. "Under

the second factor, three upwind states contribute 1 ppb or more to this receptor, with a collective contribution of 7.4 ppb (or 62% of all upwind contributions) versus Alabama's modelled contribution which is 0.88 ppb, or 7% of the total contribution of all upwind states." *Id.* And, under the third factor, "there are no other states that contribute between 1 percent and 1 ppb to this receptor" and "Alabama is not linked to any other state at or above 1 ppb." *Id.*

In response, EPA invented a brand-new metric by which to judge the use of a 1 ppb threshold. RTC at 296 (finding 7% "loss in capture of total upwind-state contributions at 1 ppb versus 1 percent…was identified as *potentially* acceptable in the August 2018 memorandum"). First, EPA's metric is at least misleading because it compares loss in capture across multiple receptors. *See id*. at 296-97. More importantly, nowhere in the August 2018 guidance does EPA state that a 1 ppb threshold is only appropriate when it does not exceed a 7% loss in total upwind contribution as compared to 0.7 ppb. *Id.* at 280.

Regardless, by any measure, Alabama's modeled contribution to Texas is low, such that the 1 ppb threshold for Alabama would be reasonable and appropriate. In fact, according to EPA's most recent modeling run, Alabama contributes only 1.05% of the ozone modeled for the Galveston receptor and 4.11% of the ozone that comes to Galveston from upwind states. EPA contends that a 1 ppb threshold would result in a loss of 19% of upwind contribution, but this is wrong (and ignores EPA's third

Iowa criteria) because the other states contributing to Galveston—Oklahoma and Arkansas—are linked to other receptors above 1 ppb, so would not be screened out. Considering only Alabama (which is the only state at issue), a 1 ppb threshold results in only a 4% loss, which is under EPA's newly-invented 7% standard anyway.

Indeed, as shown below, contributions from Alabama are *less* than those from natural sources like fires and comparable to contributions from Tennessee (and EPA has not disapproved Tennessee's SIP).

**Figure 1. Contributions to Galveston Receptor**[3]



---

[3] EPA, *2016v3 Design Values & State Contributions*, EPA-HQ-OAR-2021-0663-0070 (Feb. 2023).

Courts have rejected similar efforts by EPA to invent post-hoc standards and found EPA acted arbitrarily and capriciously when its explanation was "impossible to discern because the explanation kept shifting." *New York*, 964 F.3d at 1222. Because EPA's rejection of Alabama's threshold is arbitrary and capricious, its disapproval should be vacated.

## III. EPA Improperly Usurped Alabama's Primary Role When It Rejected Alabama's Weight-of-Evidence Analysis

EPA improperly substituted its judgment for the State's by applying its preferred, but non-statutory, 4-step framework instead of reviewing whether Alabama's assessment was "reasoned" and "consisten[t] with the Act's requirements." *Alaska*, 540 U.S. at 490-91; *Luminant*, 675 F.3d at 921.

As explained above, Alabama can determine, based solely on the "appropriate" screening threshold of 1 ppb, that potential contributions to ozone in Texas will be insignificant. However, even if some modeled contributions fell over a screening threshold (whether set at 1 ppb or 0.7 ppb), those contributions would *not* automatically be deemed "significant" but would be subject to additional analysis. If this were not the case, then the screening threshold would be determinative and not a "screening" test at all. *See* 88 Fed. Reg. at 9,371 ("EPA does not use the 1 percent…threshold as the definition of 'significance.' Rather, where a state's contribution equals or exceeds the…threshold, the EPA expects

*states* to further evaluate their emissions *to determine* whether their emissions constitute significant contribution." (emphases added)).

Accordingly, even though the 1 ppb screening threshold could have ended the matter, Alabama also considered the weight-of-evidence "to further evaluate emissions" and "determine" whether a significant contribution to downwind nonattainment exists in light of the occasional modeled contribution that may lie between 0.7 and 1 ppb—exactly as EPA instructed. *Id.*; *see* Ala. SIP at 106. Yet, EPA both unlawfully and arbitrarily and capriciously rejected Alabama's weight-of-evidence analysis in favor of its own analytic framework.

### A. Alabama's state-specific, weight-of-evidence analysis reasonably concludes that Alabama does not significantly contribute to downwind nonattainment.

Because Alabama's weight-of-evidence analysis is "reasoned" and meets the requirements of the CAA, EPA's disapproval of Alabama's SIP was unlawful and arbitrary and capricious. *Alaska*, 540 U.S. at 490; *see AEC*, 711 F.3d at 1280

A weight-of-evidence analysis is a long-standing approach for assessing the good neighbor obligation. For instance, in 1998, EPA applied a "weight-of-evidence determination" for determining whether a contribution is "significant," rather than relying on a particular threshold. 63 Fed. Reg. 57,356, 57,381 (October 27, 1998). More recently, in 2016, EPA approved Arizona's good neighbor SIP for the 2008 ozone NAAQS "consider[ing] the total weight of all the evidence taken together to

evaluate whether Arizona significantly contributes to [downwind] nonattainment."
81 Fed. Reg. 15,200, 15,203 (Mar. 22, 2016). In that instance, Arizona emissions
affected two receptors in California above the screening threshold, but EPA
approved Arizona's SIP based on "the total weight of all the evidence taken
together." *Id.*

And with respect to the 2015 ozone NAAQS at issue here, EPA confirmed
that "states may supplement the information provided in this memorandum with any
additional information that they believe is relevant to addressing the good neighbor
provision requirements." March 2018 Guidance at 6. EPA also explained that, even
with a modeled contribution above EPA's "1 percent screening threshold," states
"could continue to consider[] other factors to evaluate [their] planning obligation
pursuant to the Good Neighbor provision." 82 Fed. Reg. at 1,739-40.

Consideration of "other factors" and supplementation of the screening
threshold with "additional information" is exactly what Alabama did. This was
particularly well-suited to Alabama's situation, where the modeling results were
always extremely small—either below both of the candidate screening thresholds of
0.7 and 1 ppb or between them.[4] Accordingly, Alabama's SIP submittal assesses

---

[4] In EPA's four model runs in the record, Alabama's impact on nonattainment or
maintenance receptors in Texas ranged from 0.41 ppb to 0.88 ppb and averaged 0.64
ppb. *See infra* note 6.

overall and specific emissions data, several meteorological metrics, emission controls on in-state sources, model variations, and the small magnitude of EPA's modeled impacts. These factors, individually and taken as a whole, confirm that the "mix of emissions limitations" already in effect in Alabama would "adequately prohibit" any significant contribution to nonattainment in metropolitan Texas, notwithstanding modeled contributions that occasionally, but irregularly, landed between 1 ppb and 0.7 ppb. Each factor is described below.

### 1. Ozone precursor emissions in Alabama are well-controlled.

Alabama explains in its SIP that $NO_X$ emissions (the precursor emissions that form ozone in the atmosphere) from the State are already very well-regulated and well-controlled. Ala. SIP at 104-05. First, Alabama reiterates that "major…programs" implemented by Alabama have "led to ozone precursor emissions reductions," including mobile source rules. *Id.* at 101.

In addition, Alabama EGUs, in particular, are well-controlled because they are subject to an ozone season emissions cap which requires EGUs to achieve all cost-effective reductions. This program and others have led to the following trend in emissions from Alabama:

**Figure 2. NOₓ Emissions from Alabama EGUs**[5]



Alabama's submittal specifically calculates that emissions from EGUs have decreased on the order of 80%. Ala. SIP at 105. Alabama's analysis also distinguishes between emissions from mobile and stationary sources, concluding that mobile source emissions originating at ground level—which constitutes over 60% of Alabama NOₓ emissions—would remain locally. *Id.* at 81-82, 105. This

---

[5] Emissions data from EPA's Emissions Trends Database, https://www.epa.gov/air-emissions-inventories/air-pollutant-emissions-trends-data (State Tier1 CAPS Trends).

analysis weighs in favor of finding Alabama's current approach to regulating emissions "adequately prohibits" significant contribution to downwind nonattainment.

## 2. Meteorological data confirms that Alabama does not significantly contribute to ozone in Houston.

Alabama considered meteorological data in its weight-of-evidence analysis to determine how emissions from Alabama could physically contribute to ozone in Texas. As a starting point, air rarely moves from Alabama westward into Texas. The data confirm as much. *See* Ala. SIP at 104. Specifically, because nonattainment is defined by the measure of ozone recorded on particular days, Alabama examined meteorology on the calendar days in which Houston—the nonattainment area EPA's most recent modeling iteration links to Alabama—experienced increased ozone levels. The State's analysis demonstrates that air traveling from Alabama to Texas on those days was "well dispersed" and "away from any emission sources in Alabama." Ala. SIP at 112-133. In fact, the SIP submittal examines the wind direction recorded at various locations in Alabama on those dates and confirms that the meteorological records "do not reflect wind moving west towards Texas" on any of those relevant days. *Id.* at 81.

Alabama went further and specifically examined thirty-six "back trajectories" from the National Oceanic and Atmospheric Administration's HYSPLIT model for those dates. *Id.* at 107-145. The HYSPLIT model is built to "simulate the dispersion

and trajectory of substances transported and dispersed through our atmosphere, over local to global scales." NOAA, Air Resources Laboratory, *Hysplit*, tinyurl.com/5n6tu983 (last visited Sept. 19, 2023). An example of these back trajectories shows how disconnected Alabama emissions are from the Houston nonattainment area:



Ala. SIP at 132; RTC at 358.

In fact, Alabama's HYSPLIT analysis shows, and EPA does not dispute, that air packets from Alabama could only have physically reached the Houston area on 4 out of 31 relevant days in which ozone was elevated. Ala. SIP at 104; *see* 87 Fed. Reg. at 64,424. Moreover, the record establishes that $NO_X$ emissions from Alabama on those four days were from -21% to -42% *below* the daily level EPA defines as a "significant contribution." Disapproval Comments, at 14-15. In other words, air in Alabama rarely migrated to Houston, and on the rare occasions it did, emissions from Alabama were low. This evidence plainly weighs toward a finding that Alabama's contributions to the Houston region are not significant.

### 3. EPA's own modeling supports Alabama's weight-of-evidence approach.

Finally, Alabama considered the various modeling results generated by EPA, including modeling EPA produced well after EPA's deadline to act on Alabama's initial SIP submission. To that end, Alabama's SIP submittal recognized that none of the several versions of EPA's modeling showed any contribution above 1 ppb to any downwind nonattainment or maintenance area. Ala. SIP at 82-83, 104. Likewise, Alabama noted that EPA's modeling did not identify any impacts to nonattainment areas over 0.7 ppb in 2026. Ala. SIP at 104. These "additional factors" likewise support Alabama's finding.

Moreover, Alabama considered that EPA's modeling results were inconsistent. Alabama explained that the variable results in EPA's modeling led to the conclusion that "such a small threshold could [not] adequately represent…impacts from hundreds of miles away." *Id.* at 105. Alabama also considered that EPA's model had a bias of +/- 2.9 to 6.1 ppb in the southeast and noted that the modeled impact ascribed to Alabama "clearly falls within the noise of the model." *Id.*

Comparing EPA's ever-shifting modeling results confirms the reasonableness of conducting a more holistic review:

**Table 1. EPA Modeled Contributions in ppb at Texas Receptors** (by model run)[6]

| Receptor | Alabama (Dec. 2016) | Alabama (Mar. 2018) | Alabama (2016v2) | Alabama (2016v3) | Texas (2016v3) |
|---|---|---|---|---|---|
| Denton County 481210034 | 0.48 | 0.49 | 0.71 | 0.45 | 28.72 |
| Harris County 482010055 | 0.83 | 0.77 | 0.88 | 0.65 | 28.74 |
| Galveston County 481671034 | 0.57 | 0.41 | not modeled | 0.75 | 19.31 |

Considering the variability in modeled contributions from Alabama, it becomes clear that, if ever there were a case for applying a reasonable, weight-of-evidence analysis, it would be this one. Because any and all modeled contributions from Alabama are small, Alabama's decision to consider the weight-of-the-evidence and conclude the State does not significantly contribute to downwind ozone is surely reasonable.

Undoubtedly, Alabama's assessment of "other factors" and "additional information" (such as meteorology, the magnitude and variability of modeled impacts, declining emissions, and the existing suite of regulations) was "reasonably moored" to the record and the statute. *North Dakota*, 730 F.3d at 766. Because the

---

[6] Data from EPA-HQ-OAR-2016-0751-0007 (Dec. 2016); EPA-HQ-OAR-2021-0663-0019 (Mar. 2018); EPA-HQ-OAR-2021-0663-0012 (2016v2); EPA-HQ-OAR-2021-0663-0070 (2016v3).

weight-of-evidence analysis demonstrates that the State adequately prevents emissions from significantly contributing to downwind nonattainment, Alabama's SIP "must" be approved.  *AEC*, 711 F.3d at 1280.

## B.      EPA Unlawfully Applied Its Own Methodology to Disapprove Alabama's SIP

In deciding instead to disapprove Alabama's weight-of-evidence analysis, EPA's action veered sharply from its own words.  Whereas EPA claimed states could "develop[] their own rules" and "have flexibility" to "us[e] EPA's analytical approach or somewhat different analytical approaches within these steps[] or alternative frameworks," March 2018 Guidance at 3, EPA nonetheless judged Alabama's analysis against its preferred 4-step framework and insisted any "deviation from [that] nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis."  88 Fed. Reg. at 9,340.  This lies beyond EPA's authority and was arbitrary and capricious.

*First*, EPA is overt in its application of its *FIP* methodology to Alabama's weight-of-evidence analysis, finding explicitly that Alabama's "SIP submission does not meet Alabama's obligations…based on EPA's evaluation of the SIP submission *using the 4-step interstate transport framework*."  87 Fed. Reg. at 64,421 (emphasis added).  There is no statutory or regulatory obligation for Alabama to satisfy EPA's *FIP* methodology in developing its SIP.  And this is not merely a

procedural distinction. EPA's substantive analysis was entirely dictated by its preference for the 4-step methodology.

Most glaringly, instead of assessing Alabama's analysis under the cooperative federalism framework, EPA attempted to shoehorn the various "other factors" and "additional information" Alabama considered into EPA's steps. For example, EPA complains that "control programs [identified by Alabama] were not sufficient to eliminate Alabama's linkage at *Steps 1 and 2*," and "[t]he State was therefore *obligated at Step 3* to assess additional control measures"; that Alabama's submittal "without *further Step 3 analysis* is not approvable"; and "no information was provided *at Step 4*." *Id.* at 64,426 (emphases added). Indeed, each section of EPA's review cites to its preferred methodology. *See, e.g.*, *id.* at 64,420-26. EPA's insistence on its 4-step methodology fails to respect Alabama's primary authority under the Act. *See AEC*, 711 F.3d at 1280; *City of Seabrook*, 659 F.2d at 1356; *Union Elec.*, 427 U.S. at 269. Accordingly, EPA exceeded its authority to review SIPs for a reasoned basis.

*Second*, even within EPA's non-statutory approach, Alabama would have to satisfy an undefined but heightened standard of proof to overcome the presumption EPA attaches to its "nationally consistent" framework. 88 Fed. Reg. at 9,354. For example, in considering Alabama's meteorological evidence, EPA contends the State must provide more "compelling evidence" in order for it to sway the agency.

87 Fed. Reg. at 64,425. Specifically, EPA accepted the undisputed record evidence establishing wind very rarely travels from Alabama towards Houston and agreed that the air currents "do not transect Alabama for a long enough period of time to have a meaningful [downwind] impact." *Id.* at 64,424. Still, EPA complained that the data provided in Alabama's SIP were "limited" and additional data would be required concerning the "emissions levels" in the state on those days. *Id.* Likewise, EPA declares a "much more robust analysis of emissions" would be required before EPA would accept Alabama's weight-of-evidence case. RTC at 307.

EPA's attempt to impose these heightened standards on Alabama—demanding both "compelling evidence" and "robust analysis"—confuses its role for that of the State's. EPA's refusal to accept reasonable and justified evidence supporting the State's plan cannot be squared with the requirements of the CAA. *See Train*, 421 U.S. at 79 (EPA is "plainly…relegated by the Act to a secondary role"); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 715 (8th Cir. 1979) ("[i]t is beyond dispute that agency action…which frustrates the congressional policy which underlies a statute[] is invalid").

*Finally*, EPA also acted arbitrarily and capriciously because Alabama did, in fact, submit additional emission level data and analysis showing $NO_X$ emissions from Alabama were from -21% to -42% below EPA's acceptable daily rate. Disapproval Comments at 15. But EPA moved the goal posts again, arguing these

data, which EPA itself had demanded, were now "irrelevant." RTC at 359. For these reasons, EPA's disapproval of Alabama's SIP should be reversed.

## IV.    EPA Discounted Record Evidence

Even if EPA could insist on applying its policy preferences to override Alabama's reasonable SIP—which, as discussed above, violates the CAA and misapprehends EPA's role under the Act—EPA's disapproval is still arbitrary and capricious because EPA either mistook or failed to consider record evidence demonstrating that emissions in Alabama cannot be cost-effectively reduced further. *See State Farm*, 463 U.S. at 43 (EPA action is "arbitrary and capricious if the agency has…offered an explanation for its decision that runs counter to the evidence before the agency"); *see also Nat'l Min. Ass'n v. U.S. Dep't of Lab.*, 812 F.3d 843, 865 (11th Cir. 2016) ("the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (citation and quotations omitted)). Thus, EPA's disapproval must be vacated.

EPA's failure to properly consider record evidence implicates Step 3 of its own 4-step methodology. As explained above, EPA defines "significant contribution" as only those emissions which can be "cost-effectively" reduced. *See EME Homer*, 572 U.S. at 502-03. Whether any such reductions are, in fact, available is purportedly identified under EPA's Step 3. When EPA performs this analysis for

purposes of a FIP, EPA "identifies a uniform level of emissions reduction that the covered sources in the linked upwind states can achieve." 88 Fed. Reg. 36,654, 36,675-76 (June 5, 2023). In other words, EPA identifies an emissions rate that reflects a "cost-effective" level of emission control, and determines that emissions above that level are the significant emissions that must be eliminated. *Id.* at 36,678 ("The EPA determined the level of emissions reductions associated with that level of control stringency to constitute significant contribution").

EPA recognized that "Alabama also argued in its SIP submission that it had already implemented all cost-effective controls," 88 Fed. Reg. at 9,354, but EPA found Alabama's argument "insufficient" because, it said, "[c]ost-effectiveness must be assessed in the context of the specific CAA program," 87 Fed. Reg. at 64,426. EPA apparently rejected Alabama's argument because it believed Alabama was only assessing costs relative to the prior "cost threshold" for the *2008* ozone NAAQS, but EPA is in error. *Id.* EPA's error likely arose because this is what several other states attempted. *See, e.g.*, 88 Fed. Reg. at 9,355, 58, 59. However, Alabama's submission assessed cost-effectiveness using EPA's own Step 3 analysis for the *2015* ozone NAAQS and EPA's own data. Ala. SIP at 87-89.

As explained in Alabama's SIP submission, emissions from Alabama sources are already very well-controlled. *Id.* at 101, 105. EPA's own data back this up. Specifically, EPA has itself purported to conduct an extensive analysis of cost-

effective emission control options it believes are available for sources emitting $NO_X$. For example, a combined cycle power plant should be expected to achieve $NO_X$ emission levels of 0.012 lbs/mmbtu. 88 Fed. Reg. at 36,721. And a coal-fired power plant unit should achieve 0.08 lbs/mmbtu. *Id.* Accordingly, units that exceed these emission levels are, per EPA's 4-step methodology, "significantly contributing" because they can reduce their emission rates in a cost-effective manner. *Id.* at 36,741.

EPA's unit-by-unit assessment is consolidated in a spreadsheet that identifies every individual source's cost-effective level of emissions control on a state-by-state basis. *See generally* EPA, *Ozone Transport Policy Analysis App. A*, EPA-R07-OAR-2021-0851-0016 (Mar. 2023). Plainly identified on this spreadsheet is EPA's calculated emission rate for each unit (column AG) and EPA's cost-effective emission rate that will eliminate "significant contribution." For Alabama, EPA only identifies two units in the entire state (out of 84) that it claims might have cost-effective reductions available.

Thus, as to 82 of 84 units in Alabama, *EPA's own Step 3 analysis* found that no cost-effective reductions are available. As to the remaining two units, simply put, EPA's numbers and conclusions are in error. Resolving those errors means that, even using EPA's preferred Step 3 approach and data, there are no cost-effective reductions available from sources within Alabama and no "significant contribution."

*See* Ala. SIP at 87-89. As explained in the SIP submission, EPA simply erred in its rounding of the emissions data for one unit. *Id.* As to the other, EPA forgot to account for startup periods when EPA's own selected "emission control option" cannot physically operate due to temperature constraints. *See* Disapproval Comments at 19-20.

Importantly, EPA does not dispute any of this analysis. *See* RTC at 346. Instead, EPA would reject its own methodology and claim that the cost-effectiveness data is "irrelevant." *Id.* at 359. But the Supreme Court has unambiguously found the opposite. *EME Homer*, 572 U.S. at 502-03. Thus, even under EPA's own framework, EPA should have agreed that no "significant contribution" from Alabama sources exist. EPA's disregard of record evidence results in "unexplained inconsistencies in the rulemaking record." *Sierra Club v. EPA*, 939 F.3d 649, 664 & n.76 (5th Cir. 2019) (citations and quotations omitted).

EPA's qualm is really that the information correcting EPA's cost-effectiveness analysis was put forth by Industry Petitioners, not originated by the State. *See* RTC at 346. EPA's position is absurd. First, the State incorporated and attached Industry Petitioners' comments to its SIP submission, stating the comments provide "additional information for supporting the proposed plan." Ala. SIP at 76. Second, the evidence is properly part of the SIP submission package in the administrative record and in the docket created by EPA to support its disapproval

action for Alabama. *See generally* Ala. SIP; Docket EPA-R04-OAR-2021-0841. If EPA may (over Petitioners' objection) require that "significant contribution" be defined by its own preferred 4-step method in place of Alabama's weight-of evidence analysis, it makes no sense to allow EPA to then ignore record evidence related to that very method. Consider that Alabama could not have included EPA's most recent modeling (released after EPA's proposed disapproval) in its SIP submittal either, but EPA is happy to consider those data—not originated by the State—when applying its 4-step method to disapprove Alabama's SIP. This is stark and ends-driven cherry-picking.

Indeed, EPA itself has previously found that analyses and information attached to a SIP submittal are relevant to EPA's review of that submittal. *See Sierra Club*, 939 F.3d at 667 (discussing EPA's analysis of the "entirety of" the state's SIP, including analyses provided in comments by industry). EPA cannot "choose to embrace" information provided by industry in one case, then dismiss industry comments in another, just because that information counters EPA's position. As in *Sierra Club v. EPA*.

EPA should take the record as it finds it and "shall approve such submittal *as a whole* if it meets all of the applicable requirements." 42 U.S.C. § 7410(k)(3) (emphasis added); *see also AEC*, 711 F.3d at 1280. EPA's willful ignorance of the

cost-effectiveness data properly placed in the record is further evidence that it improperly disapproved Alabama's SIP.

## V. Venue is Proper Only in This Court

The CAA's venue provision provides that any "final action…which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit." 42 U.S.C. § 7607(b)(1). This Court determines whether EPA's action is "locally or regionally" or "nationally" applicable "by analyzing the nature of the EPA's action." *RMS*, 64 F.4th at 1372. In this case, review the *relevant action* is EPA's disapproval of Alabama's "section 7410" SIP, which is quintessentially local. 42 U.S.C. § 7607(b)(1) ("any implementation plan under section 7410"). If a "local action," however, is "based on a determination of nationwide scope or effect" and EPA's publishes a finding to that effect, review is only available in the D.C. Circuit. *Id.* Because EPA's action on Alabama's SIP is "locally applicable" and was based on state-specific determinations, venue is proper in this Court. *See* Pet'rs' Resp. to Jurisdictional Question, Doc. 13.

### A. EPA's action disapproving Alabama's SIP is a stand-alone action.

To determine "the nature of the [] action," the Court must first identify the relevant "action" at issue. Here, EPA disapproved Alabama's SIP, which is applicable solely within the state of Alabama.

The CAA provides that "each State" submits its own SIP in response to the NAAQS. 42 U.S.C. § 7410(a). Once EPA finds *each* SIP complete, it "approves or disapproves *each State'*s SIP." *Texas v. EPA*, No. 23-60069, slip op. at 8 (5th Cir. May 1, 2023) (citing 42 U.S.C. § 7410(k)(1)-(3)). When EPA finds a state failed to submit a complete SIP or disapproves a state's SIP, EPA is given FIP authority on a *state-by-state* basis. In fact, EPA has made several prior findings in regards to the Alabama SIP at issue, and EPA's FIP authority, and each of these findings was reviewable only in this Court. *See supra* p. 12.

The only potentially confounding factor here is EPA's stratagem of publishing several independent state SIP actions in a single federal register notice, in order to amalgamate EPA's statutory obligation to review each SIP on a state-by-state basis into a "nationwide" action. But EPA's disapproval of each state's SIP is a stand-alone action and EPA's chosen method of publishing the public notice of its action cannot affect or control the relevant unit of action. *Texas,* slip op. at 9 (finding venue proper in the Fifth Circuit for EPA's disapproval of Texas, Louisiana, and Mississippi SIPs). The Fifth Circuit explained: "What controls is the CAA. And, the CAA is very clear: The relevant unit of administrative action here is the EPA's individual SIP denials." *Id.*

Similarly, the Sixth Circuit followed the reasoning of the Fifth Circuit in determining the relevant action when it found it was the proper venue for EPA's

disapproval of Kentucky's SIP. *Kentucky v. EPA*, Nos. 23-3216/3225, slip op. at 3 (6th Cir. July 25, 2023) ("What's important here is determining *what* 'final action' we are dealing with."). Likewise, this Court should also begin its venue analysis with EPA's disapproval of Alabama's 7410 SIP—the relevant unit of administrative action.

The SIP disapproval action at issue here is the opposite of the Allocation Notice in *RMS*. There, EPA was implementing a different program under the CAA, which directs EPA to establish an allocation and trading program that "allocated permits nationwide and was not restricted in geographic scope." 64 F.4th at 1374. Thus, this Court reasoned that the Allocation Notice was really one EPA action with the petitioner's line-item allocation an inseparable part of it. *Id.* This Court explained that, in that program, Congress "created a…'zero-sum' game for the HFC industry," because "[a]ny gain in permits that one firm gets must be offset by a loss to another firm and vice versa." *Id.* In contrast, EPA's action on Alabama's SIP was separately proposed, and EPA's final decision was entirely independent and severable from its decisions as to other state's SIPs, *see* 88 Fed. Reg. at 36,693 (confirming even EPA's FIPs for each state are severable); this is the case even though EPA decided to publish those actions in a single notice.

In addition, the Court stated, "we look to the face of the challenged EPA action" as designated in the petition for review. *RMS*, 64 F.4th at 1373. The face of

the actual regulatory action at issue is a single, specific edit to 40 CFR part 52, subpart B entitled "Approval and Promulgation of Implementation Plans…Subpart B—Alabama," which references no other state.  88 Fed. Reg. at 9,381.

In sum, EPA's disapproval of Alabama's SIP is a standalone action, regardless of how it was packaged.

### B.    Disapproval of Alabama's SIP is locally or regionally applicable.

On its face, this standalone action, and its legal impact, are limited to Alabama, therefore, the action is inherently locally or regionally applicable.

"Courts have long held that 'SIP rulemakings' are the 'prototypical locally or regionally applicable action that may be challenged only in the appropriate regional court of appeals.'"  *Texas*, slip op. at 9-10 (quoting *Am. Road & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455 (D.C. Cir. 2013)).  This is because "SIPs are necessarily about individual States and are thus 'purely local' and 'undisputedly regional.'"  *Id.* at 10 (quoting *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1199 (10th Cir. 2011)).  So too, here.

In disapproving the Alabama SIP, EPA relies on the rationale provided by the Region 4 office in the proposed disapproval, which was *not* combined with any other state and for which a regional docket was established.  *See* 88 Fed. Reg. at 9,354-55. EPA, itself, confirmed as much in the final rule when it stated that each states' SIP

"were evaluated on their own merits," *id.* at 9,354, "in light of the facts and circumstances of *each particular state's* submission, *id.* at 9,340 (emphasis added).

This Court also looks to geography to determine the scope of an action. In contrast to the Allocation Notice in *RMS*, EPA's SIP disapproval is clearly limited by geography—it disapproves Alabama's plan to control emission sources within Alabama. Whereas RMS of Georgia could have moved a facility to another state and its HFC allowances would not have changed, the same calculus does not apply in the decision to approve or disapprove a SIP, which is necessarily focused on the *state's* SIP submission. *See* 64 F.4th at 1373; *see also Kentucky*, slip op. at 5 ("[SIPs], by their very nature, concern each State's plan").

Moreover, the legal impact of EPA's disapproval of Alabama's SIP also shows that this is a local action. Disapproval of Alabama's SIP affects only Alabama and its sources and citizens. Neither EPA's bundling of the action with other disapprovals, nor the "interstate nature of ozone pollution," changes this fact. Resp'ts' Resp. to Jurisdictional Question, Doc. 14, at 15.

Under the CAA, EPA must consider whether each SIP meets the requirements of the CAA based on that individual state's submission. That action is inherently local.

**C.   EPA's disapproval of Alabama's SIP is not based on a determination of nationwide scope or effect.**

Because EPA's disapproval of Alabama's SIP is "locally or regionally applicable," not "nationally applicable," the default presumption is that venue is only in this Court. *See* 42 U.S.C. § 7607(b)(1). The exception: when those actions are "based on a determination of nationwide scope or effect" *and* EPA has made an adequate finding to that effect. *Id.*; *see also Texas*, 829 F.3d at 418. Here, neither is true. First, the core determinations that led to the disapproval of Alabama's SIP are unquestionably unique to Alabama. And just as fatal, EPA made no specific findings as to Alabama's SIP disapproval.

While the Eleventh Circuit has not had opportunity to consider the exception for locally applicable actions, the Fifth Circuit and Sixth Circuits have explained that section 307(b)(1) requires review of "the justifications the agency gives for the action" the challenge is "based on," *Texas*, 829 F.3d at 419, which is a "context-specific question…[involving] EPA's factual conclusions…underlying the determination," *Kentucky*, slip op. at 5 (quoting *Texas v. EPA*, 706 App'x 159, 165 (5th Cir. 2017)) (citation and quotations omitted).

Here, EPA's determination to disapprove Alabama's SIP is entirely limited to "highly-fact bound" determinations that are "particular" to the State's SIP submittal and the peculiarities of emissions and emissions impacts assessed therein. *Id.* (quoting *Texas*, 829 F.3d at 421 n.24) (citations and quotations omitted). Those

determinations are necessarily independent of any other state's SIP because no other state has any say in Alabama's chosen emission control measures. And, while EPA argues that its action is "based on a common core of nationwide policy judgments," 88 Fed. Reg. at 9,380, EPA's application of its nationwide policy *necessarily considered Alabama's specific facts and analysis underlying Alabama's SIP. See id.* at 9,354-55 nn. 83-92; *id.* at 9,354 (the "full basis for the EPA's disapprovals is available in relevant Federal Register notifications of proposed disapproval for each state").

Just as consequential, EPA did not find or publish the required determination. Because EPA's putative finding would only have relevance once this Court had already determined that the SIP for Alabama was local or regionally applicable, *see* 42 U.S.C. § 7607(b)(1), it is this local, independent action for which EPA must make its finding. Instead, EPA offered a generic statement purportedly applicable to all the state SIP actions contained in the omnibus notice. *See* 88 Fed. Reg. at 9,381. But EPA's one-size-fits-all finding treats the separate SIP disapprovals as to each state as a single, nationally applicable action. Because this is a false premise, EPA's generic statement cannot serve as an adequate determination for the standalone, local SIP disapproval for Alabama.

In sum, the action before the Court is the disapproval of an Alabama-specific SIP, which EPA disapproved based on claims of state-specific deficiencies. Venue for this locally applicable action is proper only in this Court.

## CONCLUSION

For any of the reasons set out above, the Court should vacate EPA's unlawful disapproval of Alabama's SIP.

Respectfully submitted this 20th day of September, 2023.

STEVE MARSHALL
ATTORNEY GENERAL

/s/ Robert D. Tambling
Robert D. Tambling (TAM001)
*Assistant Attorney General*

/s/ Lindsay S. Dawson Barton
Lindsay S. Dawson Barton (DAW017)
*Assistant Attorney General*

**ADDRESS OF COUNSEL:**
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 242-2848
E-Mail: Robert.Tambling@AlabamaAG.gov

/s/ Paul Christian Sasser, Jr.
Paul Christian Sasser, Jr.
*Assistant Attorney General*

/s/ Steven Shawn Sibley
Steven Shawn Sibley
*Assistant Attorney General*

**ADDRESS OF COUNSEL:**
Alabama Department of Environmental Management
Office of General Counsel
P.O. Box 301463
Montgomery, Alabama 36130-1463
Phone: (334) 271-7855
Fax: (334) 260-4544
Email: pcsasser@adem.alabama.gov
        ssibley@adem.alabama.gov

s/ C. Grady Moore III
C. Grady Moore III
Claire B. Johnson
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
gmoore@balch.com

*Counsel for Alabama Power Company and PowerSouth Energy Cooperative*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel states that this Brief complies with Fed. R. App. P. 32(a)(7) because it does not exceed 13,000 words, excluding the parts exempted by Fed. R. App. P. 32(f). This response complies with typeface and type-style requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

**Dated: September 20, 2023**

/s/ Robert D. Tambling
Robert D. Tambling (TAM001)
*Assistant Attorney General*

/s/ C. Grady Moore III
C. Grady Moore III
*Counsel for Alabama Power Company and PowerSouth Energy Cooperative*

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing Brief using the Court's CM/ECF system, which will electronically serve all counsel of record registered to use the CM/ECF system.

**Dated: September 20, 2023**

/s/ Robert D. Tambling
Robert D. Tambling (TAM001)
*Assistant Attorney General*

/s/ C. Grady Moore III
C. Grady Moore III
*Counsel for Alabama Power Company and PowerSouth Energy Cooperative*