IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

Nos. 23-11173; 23-11196

STATE OF ALABAMA, *et al.*,

*Petitioners*,

v.

United States Environmental Protection Agency, *et al.*,

*Respondents*.

———————————

PETITION FOR REVIEW OF A FINAL AGENCY ACTION OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

———————————

**RESPONDENTS' BRIEF**

———————————

<div style="margin-left:50%">

TODD KIM
*Assistant Attorney General*

</div>

<div style="display:flex">

*Of Counsel*:
ROSEMARY HAMBRIGHT KABAN
DANIEL P. SCHRAMM
   *Office of the General Counsel*
   *U.S. Environmental Protection*
     *Agency*
   *Washington, D.C.*

ALBERT LIN
MIRANDA M. JENSEN
   *U.S. Department of Justice*
   *Environment and Natural Resources*
     *Division*
   *P.O. Box 7611*
   *Washington D.C. 20044-7611*

</div>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

CERTIFICATE OF INTERESTED PERSONS .................................................. C-1

INTRODUCTION ............................................................................ 1

STATEMENT OF JURISDICTION........................................................... 3

STATEMENT OF THE ISSUES.............................................................. 4

STATEMENT OF THE CASE................................................................. 4

    I.    Factual Background.............................................................. 4

    II.   Legal Background ............................................................... 5

        A.    Ozone National Ambient Air Quality Standards and Attainment Areas .................................................................. 5

        B.    State Implementation Plans ............................................. 6

        C.    The Good Neighbor Provision ......................................... 7

        D.    EPA's 4-Step Framework................................................ 8

    III.   Procedural Background ........................................................ 10

        A.    2018 Memoranda........................................................... 10

        B.    Alabama's Submissions ................................................. 12

        C.    EPA's Disapproval ........................................................ 16

        D.    Petitions for Review ...................................................... 20

SUMMARY OF ARGUMENT ............................................................... 20

STANDARD OF REVIEW ................................................................... 22

ARGUMENT ................................................................................ 23

    I.    Venue Lies Exclusively in the D.C. Circuit. ............................. 23

        A.    The Disapproval is Nationally Applicable. ........................ 24

        B.    EPA Properly Found and Published that the Disapproval is Based on Determinations of Nationwide Scope or Effect. ................ 28

    II.   EPA Acted Within its Clean Air Act Authority. ....................... 35

        A.    EPA Must Review SIP Submissions for Compliance with the Act... 35

        B.    EPA Reasonably Disapproved Alabama's Submission. .................... 40

1. EPA reasonably rejected Alabama's application of a 1 ppb contribution threshold. ................................................................ 40

   a. Alabama's Submission did not justify the use of a 1 ppb contribution threshold. ............................................. 40

   b. Petitioners' comments also did not adequately justify the use of a 1 ppb contribution threshold. .................................. 44

   c. EPA's rejection of a 1 ppb contribution threshold comports with the Threshold Memo. ........................................ 46

2. EPA reasonably rejected Alabama's "weight-of-evidence" analysis. ........................................................................ 48

   a. EPA reasonably relied on its modeling to evaluate Alabama's Submission. ................................................. 48

   b. Alabama's Submission confirms that Alabama is linked to downwind receptors. ................................................ 51

   c. The Submission lacks evidence to support its conclusion that no further cost-effective emissions controls are available. ........... 53

   d. Industry Petitioners' state-level comments also do not support the Submission's conclusion that no further cost-effective emissions controls are available. ............................................. 55

III. If the Court Holds for Petitioners, the Appropriate Remedy is Remand without Vacatur. ......................................................... 58

CONCLUSION .................................................................... 60

CERTIFICATE OF COMPLIANCE ................................................. 62

CERTIFICATE OF SERVICE ...................................................... 62

# TABLE OF AUTHORITIES

## CASES

*Ala. Envtl. Council v. EPA*,
711 F.3d 1277 (11th Cir. 2013) ...............................................22, 57, 58

*Alaska Dep't of Envtl. Conservation v. EPA*,
540 U.S. 461 (2004) ...........................................................................36

*Allied-Signal v. U.S. Nuclear Regulatory Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ..........................................................59

*Ariz. ex rel. Darwin v. EPA*,
815 F.3d 519 (9th Cir. 2016) .......................................................36, 39

*Ass'n of Irritated Residents v. EPA*,
686 F.3d 668 (9th Cir. 2012) ............................................................39

*ATK Launch Sys. v. EPA*,
651 F.3d 1194 (10th Cir. 2011) ..............................24, 25, 26, 27, 28

*Balt. Gas & Elec. v. NRDC*,
462 U.S. 87 (1983) .............................................................23, 39, 49

*Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*,
781 F.3d 1271 (11th Cir. 2015) ...................................................58, 59

*Catawba Cnty. v. EPA*,
571 F.3d 20 (D.C. Cir. 2009) ............................................................39

*Chem. Mfrs. Ass'n v. EPA*,
28 F.3d 1259 (D.C. Cir. 1994) ....................................................48, 51

*City of Seabrook, Texas v. EPA*,
659 F.2d 1349 (5th Cir. 1981) .....................................................36, 37

*Dep't of Homeland Security v. Regents*,
140 S. Ct. 1891 (2020) .......................................................................47

*EME Homer City Generation, L.P. v. EPA*,
   795 F.3d 118 (D.C. Cir. 2015) ...................................................48

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ...................................................................47

*EPA v. EME Homer City, LP*,
   572 U.S. 489 (2014) ....................................... 5, 7, 8, 9, 25, 33, 38, 60

*Gen. Motors Corp. v. United States*,
   496 U.S. 530 (1990) .....................................................................5

*Heal Utah v. EPA*,
   77 F.4th 1275 (10th Cir. 2023) .................................................14

*Maryland v. EPA*,
   958 F.3d 1185 (D.C. Cir. 2020) ...........................................7, 59

*Miccosukee Tribe of Indians v. United States*,
   566 F.3d 1257 (11th Cir. 2009) .....................................23, 39, 49

*Midwest Ozone Grp. v. EPA*,
   61 F.4th 187 (D.C. Cir. 2023) ....................................................8

*Miss. Comm'n on Envtl. Qual. v. EPA*,
   790 F.3d 138 (D.C. Cir. 2015) ............................................5, 7, 52

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983) ...................................................................57

*Murray Energy Corp. v. EPA*,
   936 F.3d 597 (D.C. Cir. 2019) ...........................................4, 5, 52

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) ..................................................................23

*North Carolina v. EPA*,
   550 F.3d 1176 (D.C. Cir. 2008) ................................................60

*North Dakota v. EPA,*
    730 F.3d 750 (8th Cir. 2013) ............................................................37, 38, 39, 43

*NRDC v. EPA,*
    777 F.3d 456 (D.C. Cir. 2014) ...........................................................................6

*Oklahoma v. EPA,*
    723 F.3d 1201 (10th Cir. 2013) ....................................................................37, 39

*RMS of Ga., LLC v. EPA,*
    64 F.4th 1368 (11th Cir. 2023) .................................................................24, 25, 28

*S. Ill. Power Coop. v. EPA,*
    863 F.3d 666 (7th Cir. 2017) ....................................................................24, 25, 28

*Sierra Club v. EPA,*
    939 F.3d 649 (5th Cir. 2019) ............................................................................56

*Sierra Club v. Johnson,*
    436 F.3d 1269 (11th Cir. 2006) .........................................................................22

*Sierra Club v. Johnson,*
    541 F.3d 1257 (11th Cir. 2008) .........................................................................23

*Texas v. EPA,*
    No. 10-60961, 2011 WL 710598 (5th Cir. Feb. 24, 2011) ..................................25

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) ..............................................................29, 30, 31

*Train v. NRDC,*
    421 U.S. 60 (1975) ......................................................................................5, 6

*Union Elec. v. EPA,*
    427 U.S. 246 (1976) ....................................................................................5, 6

*W. Va. Chamber of Commerce v. Browner,*
    166 F.3d 336 (4th Cir. Dec. 1, 1998) (unpublished)...........................................25

*Wallace v. FedEx Corp.*,
  764 F.3d 571 (6th Cir. 2014) ............................................................27

*Westar Energy v. EPA*,
  608 F. App'x 1 (D.C. Cir. 2015) ......................................................39

*Wisconsin v. EPA*,
  938 F.3d 303 (D.C. Cir. 2019) ..........................................7, 8, 10, 60

**STATUTES**

5 U.S.C. § 706(2)(A), (C), & (D)..........................................................22

42 U.S.C. §§ 7401–7515 .......................................................................8

42 U.S.C. §§ 7401–7671q .....................................................................5

42 U.S.C. § 7401(b)(1).........................................................................5

42 U.S.C. § 7407(d) ..............................................................................6

42 U.S.C. § 7409(b) ...........................................................................5, 6

42 U.S.C. § 7410(a) ..............................................................................6

42 U.S.C. § 7410(a)(2)(A) ...................................................................57

42 U.S.C. § 7410(a)(2)(C)....................................................................57

42 U.S.C. § 7410(a)(2)(D)(i)(I)...........................................4, 8, 9, 10, 38, 54

42 U.S.C. § 7410(c)(1) ..........................................................................7

42 U.S.C. § 7410(i) ...............................................................................7

42 U.S.C. § 7410(k) ..............................................................................7

42 U.S.C. § 7410(k)(2)–(4) ...................................................................7

42 U.S.C. § 7410(k)(3)........................................................10, 35, 36, 37, 38

42 U.S.C. § 7410(k)(4) ..........................................................37, 38

42 U.S.C. § 7410(*l*) ...........................................................7, 38

42 U.S.C. § 7413 ....................................................................7

42 U.S.C. § 7479(3) ..............................................................36

42 U.S.C. § 7511(b)(1) .........................................................6

42 U.S.C. § 7607(b)(1) ........................... 3, 4, 20, 21, 24, 28, 29

## CODE OF FEDERAL REGULATIONS

40 C.F.R. pt.51 Appx. V 2.1(h) ........................................15, 55

## FEDERAL REGISTER

41 Fed. Reg. 56767 (Dec. 30, 1976) ...................................32

70 Fed. Reg. 25162 (May 12, 2005) ....................................42

76 Fed. Reg. 48208 (Aug. 8, 2011) .....................................42

80 Fed. Reg. 65292 (Oct. 26, 2015) .....................................6

81 Fed. Reg. 74504 (Dec. 27, 2016) ...................................45

84 Fed. Reg. 71854 (Dec. 30, 2019) ...................................13

87 Fed. Reg. 9477 (Feb. 22, 2022) ....................................44

87 Fed. Reg. 9498 (Feb. 22, 2022) ....................................19

87 Fed. Reg. 9516 (Feb. 22, 2022) ....................................19

87 Fed. Reg. 9545 (Feb. 22, 2022) ................................13, 45

87 Fed. Reg. 9798 (Feb. 22, 2022) ....................................19

87 Fed. Reg. 9838 (Feb. 22, 2022) ...........................................................19

87 Fed. Reg. 31443 (May 24, 2022) ........................................................19

87 Fed. Reg. 60897 (Oct. 7, 2022) ......................................................6, 59

87 Fed. Reg. 64412 (Oct. 25, 2022)............................. 10, 12, 13, 16, 17, 18, 19, 40,
................................................................ 42, 43, 48, 50, 51, 52, 53, 56

88 Fed. Reg. 9336 (Feb. 13, 2023) ................. 3, 9, 10, 11, 16, 17, 18, 19, 20, 24, 26
.......................................................... 27, 28, 30, 31, 33, 40, 42, 43, 44, 45, 46
.......................................................... 47, 48, 49, 50, 51, 53, 54, 57

88 Fed. Reg. 36654 (June 5, 2023) ...................................................20, 60

88 Fed. Reg. 67102 (Sept. 29, 2023) .......................................................20

## LEGISLATIVE HISTORY

S. Rep. No. 101-228 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385 ........................4

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 26.1-2, the undersigned certifies that, to the best of his knowledge, the following persons or entities may have an interest in the outcome of this case:

1. Alabama Department of Environmental Management

2. Alabama Power Company (ALP-PQ)

3. Balch & Bingham LLP (counsel for Petitioners Alabama Power Co. & PowerSouth Energy Coop.)

4. Dawson, Lindsay S., (counsel for Petitioner State of Alabama)

5. Garland, Merrick B., Attorney General, U.S. Dept. of Justice

6. Gettle, Jeaneanne, Acting Regional Administrator, U.S. EPA, Region 4

7. Jensen, Miranda M., (counsel for Respondents)

8. Johnson, Claire B. (counsel for Petitioners Alabama Power Co. & PowerSouth Energy Coop.)

9. Kim, Todd – Assistant Attorney General, U.S. Dept. of Justice

10. LeFleur, Lance R. – Director, Alabama Dept. of Environmental Management

11. Lin, Albert, (counsel for Respondents)

12. Marshall, Steve – Attorney General, State of Alabama

13. Moore, III, C. Grady (counsel for Petitioners Alabama Power Co. &

PowerSouth Energy Coop.)

14. PowerSouth Energy Cooperative

15. Prieto, Jeffrey M., General Counsel, U.S. EPA

16. Regan, Michael S. – Administrator, U.S. EPA

17. SABIC Innovative Plastics US, LLC

18. Sasser, Paul Christian, Jr. (counsel for Petitioner Alabama Dept. of Environmental Management)

19. Saudi Basic Industries Corporation (2010 SR)

20. Sibley, Steven Shawn (counsel for Petitioner Alabama Dept. of Environmental Management)

21. State of Alabama

22. The Southern Company (SO) (Parent Company of Alabama Power Co.)

23. Tambling, Robert D. (counsel for Petitioner State of Alabama)

24. U.S. Environmental Protection Agency

Dated: November 20, 2023

/s/ Albert Lin
ALBERT LIN
United States Department of Justice
Environment & Natural Resources
   Division
P.O. Box 7611
Washington D.C. 20044
(202) 514-2741
albert.lin@usdoj.gov

Counsel for Respondents

**INTRODUCTION**

Ground-level ozone is an air pollutant that not only harms humans and vegetation, but also heeds no geographic boundaries. Congress enacted the Clean Air Act's Good Neighbor Provision to remedy the problem of interstate transport of air pollutants, including ozone. Specifically, the Provision requires states to "prohibit" emissions that will contribute significantly to nonattainment or interfere with maintenance of national ambient air quality standards in other states. Through this Provision, Congress ensured that each state would take responsibility for its fair share in addressing downwind air quality problems. Congress charged EPA with overseeing the Provision's implementation, authorizing EPA to disapprove states' implementation plans for not complying with it.

Here, EPA addressed 21 states' implementation plans in a single rule, the Disapproval. EPA disapproved Alabama's Submission, which claimed – without adequate justification – that Alabama's emissions do not significantly contribute to nonattainment or interfere with Texas's ability to maintain the federal ozone standard. Alabama, in turn, did not include any enforceable emission-reduction measures in its Submission. Petitioners now challenge the Disapproval as it applies to Alabama.

Preliminarily, venue is not proper in this Court. Congress identified the D.C. Circuit as the exclusive venue for review of this action on either of two grounds.

First, the Disapproval addresses 21 states using a national analytical framework, and is therefore "nationally applicable." Second, even if considered "locally or regionally applicable," the Disapproval is based on multiple determinations of "nationwide scope or effect" found and published by EPA. These determinations concerned both EPA's analytical framework and its evaluation of states' alternative approaches. In the Disapproval, including as applied to Alabama, EPA made a uniform set of policy judgments to ensure national consistency and avoid inequitable results among states. These petitions therefore belong in the D.C. Circuit.

If this Court reaches the merits of the petitions, it should deny them because EPA reasonably disapproved Alabama's Submission for not complying with the Good Neighbor Provision. Petitioners claim that EPA seeks to hold Alabama to an unacceptably high standard of technical justification. But it was Congress that obligated states to demonstrate compliance with the Act, while simultaneously requiring EPA to independently evaluate whether states have done so. That is what EPA did here.

Applying its longstanding technical expertise in addressing the problem of interstate ozone pollution, EPA identified flaws in Alabama's Submission that undermined Alabama's conclusion that its emissions do not significantly contribute to downwind air quality problems. Specifically, Alabama evaluated EPA modeling

that projected Alabama would contribute ozone pollution to Texas above EPA's longstanding "contribution threshold." Alabama sought to dismiss this finding in several ways, but none of its arguments holds water. Alabama failed to justify the use of an alternative, higher contribution threshold. Alabama's additional "weight-of-evidence" analysis fared no better. It attempted to discredit EPA's sophisticated air quality modeling by misconstruing the model's bias and error rates. Alabama also over-relied on wind trajectories that did not contradict EPA's modeling. Finally, Alabama claimed – without any analysis – that it could not cost-effectively reduce its sources' emissions any further.

This Court should therefore dismiss or transfer these petitions. If it reaches the merits, this Court should uphold the Disapproval.

## STATEMENT OF JURISDICTION

The Disapproval, entitled "Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 9336 (Feb. 13, 2023) ("Disapproval"), constitutes final agency action subject to judicial review under 42 U.S.C. § 7607(b)(1). However, pursuant to 42 U.S.C. § 7607(b)(1), the timely-filed petitions should be dismissed or transferred to the D.C. Circuit. *Infra* Arg. I.

## STATEMENT OF THE ISSUES

1.      Whether venue lies exclusively in the D.C. Circuit under 42 U.S.C. § 7607(b)(1), as the Disapproval is nationally applicable or, if locally or regionally applicable, is based on determinations of nationwide scope or effect made and published by EPA.

2.      Whether EPA's technical evaluation and disapproval of Alabama's Submission gave reasonable effect to the Act, case law, and EPA's longstanding practice in implementing the Good Neighbor Provision, 42 U.S.C. § 7410(a)(2)(D)(i)(I).

3.      Whether, if the Court determines that remand is appropriate, vacatur would be improper because EPA could correct any defects in the Disapproval on remand, and vacatur would be disruptive of EPA's Good Neighbor Plan.

## STATEMENT OF THE CASE

## I.      Factual Background

Ground-level ozone is harmful to public health and welfare. In humans, ozone can "cause lung function impairment, chest pains, shortness of breath, coughing, nausea, throat irritation, increased susceptibility to respiratory infections and in high enough levels, death." S. Rep. No. 101-228 at 6 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3789. Ozone can also damage crops, trees, and other vegetation. *Murray Energy Corp. v. EPA*, 936 F.3d 597, 605 (D.C. Cir. 2019). It is

formed by the interaction of precursor pollutants such as nitrogen oxides and volatile organic compounds in the presence of sunlight in the atmosphere. *Id.*

Both ozone and its precursor pollutants can travel long distances, subject to "the vagaries of the wind," and impact ozone levels many miles downwind. *EPA v. EME Homer City, LP*, 572 U.S. 489, 497 (2014); *Miss. Comm'n on Envtl. Qual. v. EPA*, 790 F.3d 138, 147 (D.C. Cir. 2015).

## II. Legal Background

The Clean Air Act, 42 U.S.C. §§ 7401–7671q, seeks "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare," *id.* § 7401(b)(1), and to control air pollution through a system of shared federal and state responsibility, *see Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). The Act, as amended, reflects "sharply increased federal authority" following "congressional dissatisfaction with the progress of existing air pollution programs and a determination to . . . guarantee the prompt attainment and maintenance of specified air quality standards." *Train v. NRDC*, 421 U.S. 60, 64 (1975); *Union Elec. v. EPA*, 427 U.S. 246, 249 (1976).

### A. Ozone National Ambient Air Quality Standards and Attainment Areas

The Act directs EPA to set National Ambient Air Quality Standards ("NAAQS") for specific pollutants, including ozone, at levels requisite to protect public health and welfare. 42 U.S.C. § 7409(b). Each NAAQS establishes a

pollutant's permissible outdoor concentrations. *Id.* EPA most recently revised the ozone NAAQS in 2015, strengthening it to 70 parts per billion ("ppb"). 80 Fed. Reg. 65292 (Oct. 26, 2015) ("Ozone Standard"). Upon revision, EPA must designate all areas of the country as "attainment," "nonattainment," or "unclassifiable." 42 U.S.C. § 7407(d). A nonattainment designation triggers a statutory deadline by which the area must come into attainment. *Id.* § 7511(b)(1); *see also NRDC v. EPA*, 777 F.3d 456, 465–66 (D.C. Cir. 2014). Many ozone nonattainment areas continue to exceed the Ozone Standard and must therefore adopt increasingly stringent means to come into attainment. 87 Fed. Reg. 60897 (Oct. 7, 2022).

### B.    State Implementation Plans

All states, regardless of whether they have nonattainment areas, must adopt state implementation plans ("SIPs") that are adequate to implement, maintain, and enforce the Ozone Standard. 42 U.S.C. § 7410(a). States must submit SIPs for EPA's review within three years of a NAAQS revision. *Id.*

While the Act places "primary responsibility for formulating pollution control strategies" on states, it contains "strict minimum compliance requirements" for attaining the NAAQS. *Union Elec.*, 427 U.S. at 256–57 (quoting *Train*, 421 U.S. at 91). If the SIP contains all required components, EPA deems the SIP

complete and then, within one year of that determination, must independently evaluate the SIP for compliance with the Act. 42 U.S.C. § 7410(k).

If EPA concludes the SIP complies with the Act and approves it, the SIP's provisions become enforceable as a matter of federal law and cannot be modified except by EPA's approval of a SIP revision. *Id.* §§ 7410(i), (*l*), 7413. If EPA determines a SIP does not meet the Act's requirements, it must issue a full or partial disapproval. *Id.* § 7410(k)(2)–(4). In that case, EPA must promulgate a federal implementation plan ("FIP"). *Id.* § 7410(c)(1). EPA may do this any time within two years, and need not "postpone its action even a single day." *EME Homer*, 572 U.S. at 509.

### C. The Good Neighbor Provision

Air pollution heeds no boundaries, creating – especially for ozone – a "thorny causation" problem wherein upwind state emissions unduly affect downwind states' ability to attain NAAQS. *Id.* at 514. Congress enacted the Good Neighbor Provision specifically to address this problem. *Wisconsin v. EPA*, 938 F.3d 303, 314 (D.C. Cir. 2019); *Maryland v. EPA*, 958 F.3d 1185, 1203–04 (D.C. Cir. 2020). The Provision is especially important for ozone, which travels great distances, subject to "the vagaries of the wind," impacting faraway areas. *EME Homer*, 572 U.S. at 497; *Miss. Comm'n*, 790 F.3d at 147.

Once EPA promulgates or revises a NAAQS, the Provision requires states to submit SIPs that "prohibit," through "adequate provisions," in-state emissions from "any source or other type of emissions activity" that "will" "contribute significantly to nonattainment" or "interfere with maintenance" of the NAAQS in other states. 42 U.S.C. § 7410(a)(2)(D)(i)(I). The Act does not define "contribute significantly" or "interfere with maintenance"; however, it requires implementation of the Provision "consistent with the provisions of" Title I of the Act, *id.* §§ 7401–7515. *Wisconsin*, 938 F.3d at 313–16 (directing that resolution of Good Neighbor obligations must be aligned with downwind attainment dates).

### D.    EPA's 4-Step Framework

For decades, EPA has used a 4-step framework to evaluate SIPs and formulate FIPs under the Good Neighbor Provision, giving meaning to each critical term in the Provision. 42 U.S.C. § 7410(a)(2)(D)(i)(I); Response to Comments, EPA-HQ-OAR-2021-0663-0083 ("RTC") at 431. Courts, including the Supreme Court, have upheld the framework as "permissible, workable, and equitable." *EME Homer*, 572 U.S. at 524; *Midwest Ozone Grp. v. EPA*, 61 F.4th 187, 189 n.1 (D.C. Cir. 2023).

Under this framework, a regulator would:

**Step 1:** Identify downwind "nonattainment" and "maintenance" receptors, which are monitoring sites that will, respectively, not attain or struggle to maintain

the NAAQS in a future year. Disapproval at 9341–42; 42 U.S.C. § 7410(a)(2)(D)(i)(I).

**Step 2:** Determine whether upwind-state emissions "contribute" to those downwind receptors. An upwind state "contributes" if its share of pollution to a downwind receptor is at or above a "contribution threshold." In prior Good Neighbor rules addressing less protective NAAQS, EPA has considered states "linked" when an upwind state's emissions contribute 1% or more of the NAAQS to a downwind state's receptor. Disapproval at 9371. For the Ozone Standard of 70 ppb, a 1% contribution threshold is 0.70 ppb. *Id.* at 9342, 9371, 9374.

**Step 3:** Determine the "amount[]" of contribution that is "significant[]" or "interfere[s] with maintenance" using a multifactor analysis of potential emissions-control strategies for upwind-state sources. *Id.* at 9342–43. The factors include the cost-effectiveness of potential emissions controls, the total emissions reductions such controls may achieve if applied across all linked upwind states, and the air quality improvements those reductions would create at downwind receptors. *Id.* This makes each state responsible for its fair share of a collective problem. *EME Homer*, 572 U.S. at 519.

**Step 4:** Ensure that the plan "contain[s] adequate provisions" "prohibiting" such emissions. *See* 42 U.S.C. § 7410(a)(2)(D)(i). The regulator would develop strategies to achieve the emissions reductions found to be necessary at Step 3 to

9

eliminate significant contribution to nonattainment or interference with maintenance. *Wisconsin*, 938 F.3d at 310–11.

While many states generally follow this framework, EPA does not mandate that states do so. 87 Fed. Reg. 64412, 64415 (Oct. 25, 2022) ("Proposal"). Additionally, the framework "allow[s] for some methodological variation" within each step. Disapproval at 9338. Regardless of the approach states take, the Act obligates EPA to evaluate whether each submission contains "adequate provisions" to comply with the Good Neighbor Provision. 42 U.S.C. § 7410(a)(2)(D)(i)(I), (k)(3). Given ozone pollution's interstate nature, EPA evaluates each SIP submission "with an eye to ensuring national consistency and avoiding . . . inequitable results." Disapproval at 9342, 9381.

## III. Procedural Background

### A. 2018 Memoranda

EPA worked with states to address their Good Neighbor obligations for the Ozone Standard. EPA provided modeling to forecast 2023 conditions, which contains the last full summertime ozone season before the August 3, 2024 deadline for certain nonattainment areas in downwind states to attain the Ozone Standard. *Id.* at 9340–41.

In March 2018, EPA issued a memorandum providing ozone modeling projections. *Id.* at 9338–39. This "Modeling Memo" included EPA's projections of

2023 ozone levels and contributions based on a 2011 platform. EPA-HQ-OAR-2021-0663-0003 ("Modeling Memo") at 4. The Modeling Memo also included "Attachment A," a list of *stakeholder*-provided ideas of potential ways to address Good Neighbor obligations for the Ozone Standard. EPA did not endorse the ideas and, instead, solicited feedback on them. *Id.* at A-1; Disapproval at 9340. Additionally, Attachment A included a set of "guiding principles" emphasizing the need for regional consistency and compliance with judicial precedent. Modeling Memo at A-1; Disapproval at 9340. EPA made clear the Modeling Memo's contents – including the unvetted stakeholder-idea list – were "not a final determination regarding states' obligations under the good neighbor provision," and that "[a]ny such determination would be made through notice-and-comment rulemaking." Modeling Memo at 2.

EPA subsequently released the August 2018 "Threshold Memo," which discussed potential alternative contribution thresholds. EPA-HQ-OAR-2021-0663-0004 ("Threshold Memo"). EPA explained "states have flexibility to follow [EPA's] framework or develop alternative frameworks to evaluate interstate transport obligations, so long as a state's chosen approach has adequate technical justification and is consistent with the requirements of the [Act]." *Id.* at 2. EPA also warned its "guidance may not apply to the facts and circumstances underlying a particular SIP." *Id.* at 1. With these caveats, the Threshold Memo suggested that,

with appropriate additional analysis, "it may be reasonable and appropriate for states to use a 1 ppb contribution threshold as an alternative to a 1 percent [0.70 ppb] threshold." *Id.* at 4. EPA did not endorse this higher threshold without reservation, stating instead: "air agencies should consider whether the recommendations in this guidance are appropriate" and "[f]ollowing these recommendations does not ensure that the EPA will approve a SIP revision." *Id.* at 1.

Lastly, EPA's October 2018 "Maintenance Memo" suggested that a state might discount an EPA-modeled maintenance receptor (versus a nonattainment receptor) by demonstrating the receptor would, in fact, not struggle to maintain the NAAQS in a future year by developing a technical analysis of meteorological and pollution trends data, including analysis showing that "ozone concentrations have been trending downward at the [receptor] since 2011." EPA-HQ-OAR-2021-0663-0005 ("Maintenance Memo") at 1–4. The ultimate objective of such analysis would be to determine whether the EPA-identified potential receptor would in fact struggle to maintain the NAAQS in the future. *Id.* at 4.

## B.    Alabama's Submissions

On August 20, 2018, Alabama submitted a SIP revision to address its Ozone Standard Good Neighbor obligations. Proposal at 64419. EPA initially proposed approving this submission because EPA's modeling at that time indicated Alabama

would not be linked above 1% of the Ozone Standard to any nonattainment or maintenance receptors in 2023. 84 Fed. Reg. 71854, 71859 (Dec. 30, 2019).

However, in collaboration with states and other stakeholders, EPA subsequently developed a new modeling platform using a 2016 "base year" to project 2023 ozone levels. Proposal at 64415. EPA then updated the 2016-based platform to include updated mobile source and electric generating unit ("EGU") emissions projections, creating the "2016v2" platform. *Id.* The 2016v2 modeling projected Alabama would contribute 0.88 ppb ozone to a nonattainment receptor in Harris County, Texas, and 0.71 ppb to a maintenance receptor in Denton County, Texas, in 2023. *Id.* at 64421 & tbl.1. The identification of these linkages raised the issue of whether these contributions were "significant." Based in part on this modeling, EPA proposed disapproving Alabama's 2018 submission. *Id.* at 64419 (citing 87 Fed. Reg. 9545, 9562 (Feb. 22, 2022)).

In April 2022, during this proposal's comment period, Alabama withdrew its 2018 submission and provided a new SIP submission using the 2016v2 modeling. *Id.* at 64419–20; *see also* EPA-R04-OAR-2021-0841-0026 ("Submission"). Alabama's Submission evaluated the 2016v2 modeling's indication that Alabama was linked to two Texas receptors. Submission at 104. Alabama sought to dismiss

these linkages by invoking EPA's 2018 Memoranda, disagreeing with the 2016v2 modeling results, and conducting its own "weight-of-evidence" analysis.[1]

First, Alabama pointed to the Threshold Memo and separate guidance issued under the Act's Prevention of Significant Deterioration ("PSD") permitting program to assert that its contribution threshold "can be set at 1 ppb." Submission at 105–06. Alabama also claimed that the Texas maintenance receptor could be disregarded under the Maintenance Memo because Alabama would continue to reduce its emissions. *Id.* at 106.

Second, Alabama contended that the 2016v2 modeling could not accurately project Alabama's contributions because the projected contributions (0.88 and 0.71 ppb) fell within the model's bias and error rates (*i.e.*, metrics used to evaluate how model predictions compare to measured data). *Id.* at 105.

Third, Alabama pointed to air flow analysis indicating that air from Alabama only moved from Alabama to Texas on four of 31 days on which Texas's air quality violated the Ozone Standard at the two receptors. *Id.* at 104. Alabama reasoned that it could not have contributed to Texas's violations because Alabama

---

[1] "Weight-of-evidence" is qualitative analysis that considers all available information, while accounting for data reliability, to inform a decision. *See Heal Utah v. EPA*, 77 F.4th 1275, 1281 n.6 (10th Cir. 2023). The term is used in many contexts and does not describe a particular set of factors. EPA's disapproval of Alabama's Submission focused on the specific arguments Alabama advanced, not Alabama's "weight-of-evidence" characterization of its analysis. *See* RTC at 304.

had good air quality on those four days. *Id.* Alabama thereby implied it will not contribute to Texas ozone issues in the future.

Fourth, Alabama argued that any contributions could not be significant because (a) most of Alabama's emissions are from mobile sources, which it claimed remain local and would decrease as vehicles are electrified; and (b) the majority of Alabama's EGUs are already "fully controlled." *Id.* at 104–05.

As required by EPA's regulations governing SIP submissions, Alabama included the two comments it received during its state-level notice-and-comment process with its Submission. *Id.* at 75–96; *see also* 40 C.F.R. pt. 51, Appx. V 2.1(h). Alabama made one revision to its Submission based on Industry Petitioners' state-level comments,[2] but did not otherwise respond to or explain its views on these comments. *Id.* at 76.

Alabama's Submission concluded that its emissions did not significantly contribute to or interfere with maintenance in another state. *Id.* at 106. Based on this conclusion, Alabama did not include any additional emission-reduction measures in its Submission.

---

[2] Industry Petitioners' state-level comments can be found in the Submission at 77–89.

## C.    EPA's Disapproval

In October 2022, EPA proposed disapproving Alabama's Submission. Proposal at 64426. EPA finalized the Proposal on January 31, 2023, as part of its Disapproval of 21 states' Ozone Standard Good Neighbor SIP submissions. Disapproval at 9336, 9354–55. As it did with every state included in the Disapproval, EPA evaluated Alabama's submission on its own merits and used the 4-step framework to organize its evaluation. *Id.* at 9338.

EPA's 2016v2 and 2016v3 modeling also informed its analysis. Proposal at 64421; Disapproval at 9339. EPA refined the 2016v2 modeling platform to 2016v3 in response to public comments on its Good Neighbor proposals. Disapproval at 9339. The 2016v3 model is "state-of-the-science" for projecting 2023 ozone concentrations and contribution levels. *Id.* at 9366. Additionally, recognizing that measured ozone levels continued to well-exceed the Ozone Standard at many monitoring stations throughout 2021 and 2022, EPA identified certain monitors as a sub-class of maintenance receptors to which states could be linked in 2023. *Id.* at 9349. The 2016v3 modeling projects that in 2023, Alabama will contribute 0.75 ppb to a Galveston County, Texas nonattainment receptor, and 0.79 ppb to a Denton County, Texas maintenance receptor. *Id.* at 9354 & tbl.III.C-2.

EPA found many common deficiencies across states' submissions, including Alabama's. First, EPA determined that Alabama's attempts to discount its linkages

were not supported by adequate justification. For instance, EPA found that

Alabama misapplied the Maintenance Memo to conclude that it could exclude the

Denton County maintenance receptor from further consideration. *Id.* at 9354, 9370.

Significantly, Alabama did not show, among other things, a downward trend in

ozone concentrations at the Denton monitor. *Compare* Proposal at 64422, *with*

Maintenance Memo at 4.

EPA also found that Alabama did not adequately justify its application of a 1

ppb contribution threshold. Disapproval at 9354; RTC at 295–97; *see also* Proposal

at 64424. In contrast to the Threshold Memo's explanation that a 1 ppb threshold

must have "adequate technical justification," Threshold Memo at 2, "Alabama

d[id] not provide discussion or analysis containing information specific to the State

or a receptor analysis for the affected monitors, as anticipated in the [Threshold

Memo], to evaluate whether the alternative threshold was appropriate to apply with

respect to the monitors to which Alabama was linked," Proposal at 64423. Nor did

the Submission elaborate on its assertion that "there is precedent for setting a 1 ppb

'significance' threshold for ozone in the PSD permitting program." *Id.*

Nevertheless, EPA pointed out that the PSD permitting program does not support a

1 ppb contribution threshold because the program's "significant impact level" is

not analogous to the contribution threshold. Disapproval at 9372. EPA also found

that Alabama's comments on the Proposal, which attempted to apply factors EPA

developed in a different Good Neighbor SIP proposal, did not support applying a 1 ppb contribution threshold for the Texas receptors. RTC at 296–97.

Second, EPA concluded that Alabama's attempts to discredit the 2016v2 modeling were flawed. Disapproval at 9354; *see also* Proposal at 64423. EPA found that Alabama misinterpreted the model's bias and error rates to assert that the 2016v2 modeling could not accurately project Alabama's contributions to the Texas receptors. Disapproval at 9354 (citing Proposal at 64422–23), 9370–71. In any case, with updates to improve model performance in response to comments, EPA found the modeling reliable to inform the final Disapproval. *Id.* at 9344–45, 9371–72; RTC at 187, 243.

Third, EPA determined that Alabama's air flow analysis did not contradict the evidence from EPA's modeling that Alabama's emissions would cause elevated ozone levels in Texas. RTC at 357–58. Alabama relied on an air flow model with limited utility that does not consider dispersion or chemical reactions of ozone precursor emissions in the atmosphere. *Id.* This stands in stark contrast to EPA's photochemical grid modeling, which is designed to "track the formation and transport of ozone" and considers air flow trajectories. Disapproval at 9352.

Fourth, EPA found several flaws in Alabama's "weight-of-evidence" arguments. *Id.* at 9354–55; *see also* Proposal at 64425–26. For instance, Alabama did not substantiate its claims that its EGU emissions were fully controlled or that

its mobile source emissions would remain localized. Disapproval at 9354 (citing Proposal at 64425–26). Alabama also did not identify or analyze any potential precursor emission reductions to assess whether any of its emissions should be considered "significant." *Id.* at 9354–55.

These issues were not unique to Alabama's Submission. Eleven other states failed to justify applying a 1 ppb contribution threshold, with Arkansas, Kentucky, Michigan, Mississippi, and Oklahoma also using the PSD program as justification. *Id.* at 9354–60 (the other six states are Illinois, Indiana, Louisiana, Missouri, Ohio, and Utah). Six other states made arguments about EPA's modeling's bias and error rates. 87 Fed. Reg. 9798, 9811 (Feb. 22, 2022) (Louisiana); 87 Fed. Reg. 9838, 9845–46, 9848 (Feb. 22, 2022) (Illinois, Indiana, Michigan); RTC at 184–87 (Mississippi, Utah). Eight other states also used back trajectories to claim they do not contribute to downwind ozone problems. RTC at 365–67 (Mississippi); 87 Fed. Reg. 9498, 9505–06, 9513–14 (Feb. 22, 2022) (Kentucky); 87 Fed. Reg. 9516, 9526 (Feb. 22, 2022) (West Virginia); 87 Fed. Reg. at 9805–06, 9809, 9812, 9814–15, 9826, 9832–33 (Arkansas, Louisiana, Texas); 87 Fed. Reg. at 9860–61 (Indiana); 87 Fed. Reg. 31443, 31449, 31454–55 (May 24, 2022) (California). An additional seven states asserted they were already implementing all available cost-effective controls. Disapproval at 9355–60 (Arkansas, California, Indiana, Kentucky, Ohio, Oklahoma, West Virginia).

EPA addressed these and other common issues through a unified set of policy, legal, and technical judgments given the "critical[] importan[ce]" of "consistency in defining [Clean Air Act] obligations." *Id.* at 9365; *see also* RTC at 391–93. EPA then found that the Disapproval is based on multiple determinations of nationwide scope or effect. Disapproval at 9380–81.

The Disapproval obligated EPA to promulgate FIPs for the covered states, including Alabama, which it did on March 15, 2023, in a rule known as the "Good Neighbor Plan," 88 Fed. Reg. 36654 (June 5, 2023). The Good Neighbor Plan is not before the Court in this litigation.

### D.     Petitions for Review

Petitioners and numerous other states and industry groups have challenged the Disapproval in eight circuit courts. This Court stayed the Disapproval as to Alabama pending judicial review. In response, EPA announced that it will not enforce the Good Neighbor Plan in Alabama and published a rule preserving the status quo while this case proceeds. 88 Fed. Reg. 67102 (Sept. 29, 2023).

## SUMMARY OF ARGUMENT

1.     The D.C. Circuit is the exclusive venue for challenges to the Disapproval because under the Act's venue provision, 42 U.S.C. § 7607(b)(1), the Disapproval either (a) is "nationally applicable" because it applies to 21 states spanning eight EPA regions and ten federal judicial circuits and EPA utilized a

nationally consistent framework to evaluate the states' Good Neighbor SIP

submissions or (b) if locally or regionally applicable, is based on multiple

determinations of "nationwide scope or effect" made and published by EPA. *Id.*

2.      If the Court decides venue is proper here, it should deny the petitions.

Although states have primary responsibility to develop SIPs, EPA must evaluate

submissions for compliance with the Good Neighbor Provision. EPA exercised its

responsibility under the Act to independently evaluate Alabama's Submission.

EPA reasonably rejected Alabama's use of a 1 ppb contribution threshold

because Alabama did not justify the threshold in its Submission. EPA also

reasonably determined that Alabama's subsequent arguments did not support a 1

ppb contribution threshold because such a threshold would fail to address

Alabama's emissions' impacts on Texas. This is fully consistent with EPA's

guidance that a 1 ppb contribution threshold "*may be* reasonable and appropriate"

if a state possesses "adequate technical justification." Threshold Memo at 2, 4

(emphasis added).

Additionally, EPA reasonably rejected Alabama's attempt to use a "weight-

of-evidence" analysis to dismiss its linkages and to assert that its emissions will not

significantly contribute to nonattainment or interfere with maintenance in

downwind states. First, Alabama improperly misconstrued attributes of EPA's

2016v2 modeling to contend that EPA's modeling was unreliable. However,

EPA's selected modeling is reliable and fit the needs of identifying states' Good Neighbor obligations. Second, Alabama's own meteorological analysis confirms that Alabama emissions travel to Texas. Alabama's analysis also fails to address multiple factors EPA accounted for, and consequently does not undermine EPA's determination that Alabama is linked to Texas. Third, Alabama did not provide sufficient information to support its assertion that its emissions are fully controlled. Rather, Alabama focused solely on EGUs and disregarded other emission sources.

Thus, EPA reasonably disapproved Alabama's Submission for lack of adequate technical justification.

3.     If the Court finds any error in the Disapproval, the appropriate remedy is remand without vacatur so that EPA may correct any identified deficiencies on remand while avoiding the disruptive consequences of vacatur.

## STANDARD OF REVIEW

The Administrative Procedure Act's "deferential" standard of review applies. *Ala. Envtl. Council v. EPA*, 711 F.3d 1277, 1285 (11th Cir. 2013). The Court may set aside the Disapproval only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; exceeds EPA's authority; or does not observe procedures required by law. *Id.* (quoting 5 U.S.C. § 706(2)(A), (C), & (D)). The Court gives deference "by reviewing for clear error, and [it] cannot substitute [its] own judgment for that of the agency." *Sierra Club v.*

*Johnson*, 436 F.3d 1269, 1273 (11th Cir. 2006). "[W]hen an agency 'is making predictions, within its area of special expertise, at the frontiers of science . . . as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.'" *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009) (quoting *Balt. Gas & Elec. v. NRDC*, 462 U.S. 87, 103 (1983)). A decision of "'less than ideal clarity' will be upheld 'if the agency's path may reasonably be discerned.'" *Sierra Club v. Johnson*, 541 F.3d 1257, 1264 (11th Cir. 2008) (quoting *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007)).

## ARGUMENT

### I.  Venue Lies Exclusively in the D.C. Circuit.

Venue is not proper in this Circuit, and dismissal or transfer is the appropriate remedy. Congress identified the D.C. Circuit as the exclusive venue for two categories of EPA's Clean Air Act actions: (1) those that are "nationally applicable" and (2) those that are "locally or regionally applicable," but "based on a determination of nationwide scope or effect" if, in taking such action, the Administrator "finds and publishes that such action is based on such a

determination." 42 U.S.C. § 7607(b)(1). The Disapproval belongs in one of these categories, and so for either reason is subject to review only in the D.C. Circuit.[3]

## A. The Disapproval is Nationally Applicable.

The "consensus" view among courts, including this Circuit, is that venue turns on "the nature of the EPA's action, not the specifics of the petitioner's grievance." *RMS of Ga., LLC v. EPA*, 64 F.4th 1368, 1372–73 (11th Cir. 2023). Whether an EPA action is "nationally applicable" is a narrow inquiry based on the "face of the challenged EPA action" and not its "practical effect[s]." *Id.*; *ATK Launch Sys. v. EPA*, 651 F.3d 1194, 1197 (10th Cir. 2011); *see also S. Ill. Power Coop. v. EPA*, 863 F.3d 666, 670–71 (7th Cir. 2017).

On its face, the Disapproval is nationally applicable. It applies to 21 state SIP submissions from across the country, throughout eight of EPA's ten regions and ten judicial circuits. Disapproval at 9380. EPA used a nationally consistent analytical framework to evaluate all 21 submissions. *Id.*

This Court reached the same result in an analogous case involving EPA's allowance allocations. *RMS*, 64 F.4th at 1369–70. The *RMS* petitioner argued that EPA's action there should be viewed as "a document detailing many smaller individual actions." *Id.* at 1374. This Court disagreed, explaining that action was

---

[3] EPA incorporates by reference its Response to Jurisdictional Question. ECF 14.

"better understood" as a "'zero-sum' game" where one firm's gain in allowances must be offset by another's loss. *Id.* The Disapproval is no different – if an upwind state does not address significant contributions to downwind air quality, downwind states must do more than their fair share to attain the Ozone Standard. *EME Homer*, 572 U.S. at 495, 519 (explaining regulations are needed to prevent "the emitting or upwind State reap[ing] the benefits of the economic activity causing the pollution without bearing all the costs" and "free riding" on others' emission reductions). EPA consequently acted on the SIPs together in the Disapproval using uniform national policy judgments regarding the duty each state owes to others.

Other courts have considered similar actions addressing multiple states in one rule to be nationally applicable. *S. Ill. Power Coop.*, 863 F.3d at 671, 674 (transferring challenge of rule "promulgated pursuant to a common, nationwide analytical method" affecting 24 states); *ATK*, 651 F.3d at 1197, 1200 (transferring challenge of rule based on single uniform regulatory approach that affected 31 areas across the country ); *Texas v. EPA*, No. 10-60961, 2011 WL 710598, *3, 5 (5th Cir. Feb. 24, 2011) (transferring challenge of rule affecting 13 states); *W. Va. Chamber of Commerce v. Browner*, 166 F.3d 336, *5–8 (4th Cir. Dec. 1, 1998) (unpublished) (transferring challenge of rule affecting 22 states and D.C.). For instance, the *ATK* petitioner challenged EPA's evaluation of each state's recommended nonattainment designations and promulgation of final designations.

651 F.3d at 1195–96. EPA carried out these statutory obligations in a single final action designating 31 areas in 18 states as "nonattainment." *Id.* at 1195, 1197. ATK argued EPA's "case-by-case consideration of areas and boundaries transforms a national standard to a regional or local rule." *Id.* at 1198. The Tenth Circuit disagreed, noting "EPA's listing of the designations applied to each locality does not, as ATK suggests, constitute a mere amalgamation of numerous local actions into a single rule." *Id.* at 1200. Instead, highlighting EPA's "uniform process and standard," the court concluded "EPA's Designations Rule constitutes its national interpretation of Clean Air Act mandates, and any challenge thereto belongs in the D.C. Circuit." *Id.* at 1197, 1200.

EPA fulfilled its statutory obligations here in a single action – the Disapproval. EPA evaluated each state's submission and technical rationale on its merits utilizing a nationally consistent analytical framework to evaluate the submissions "with an eye to ensuring national consistency and avoiding inconsistent or inequitable results among upwind states . . . and between upwind and downwind states." Disapproval at 9381. EPA explained ozone transport presents a "collective contribution" challenge, in which many smaller contributors across a broad region combine to generate downwind air quality problems. *Id.* at 9342. Given the "interdependent nature of interstate pollution transport," EPA used "a uniform legal interpretation and common, nationwide analytical methods" and

employed "a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations." *Id.* at 9339, 9380.

Because the Disapproval on its face applies to 21 states nationwide and used a uniform methodology and legal interpretation to fulfill EPA's statutory obligation to act on the SIP submissions, it is nationally applicable. *See ATK*, 651 F.3d at 1197–98, 1200. The Sixth Circuit recently transferred challenges to the Good Neighbor Plan for these reasons. Order at 4–8, *Ky. Energy & Env't Cabinet v. EPA*, No. 23-3605, ECF 19 (6th Cir. Nov. 9, 2023) ("*Kentucky FIP Order*"). Much of the Sixth Circuit's national applicability analysis applies here because the Disapproval *also* applies to the same "far flung" states and is "based on a national analysis and uniform standards." *Id.* at 5, 7.

Petitioners' reliance on two non-binding, unpublished orders from the Fifth and Sixth Circuits is unavailing.[4] Petitioners argue the only action at issue is EPA's disapproval of Alabama's Submission. Br. at 54–56 (citing *Texas 2023 Order* at 8–9; Order at 3, *Kentucky v. EPA*, No. 23-3216, ECF 39-2 (6th Cir. July 25, 2023) ("*Kentucky Order*")). But as this Court has recognized, the "final action" determines venue under the Act, not the particular aspects a petitioner challenges.

---

[4] These orders are not binding on even those courts' merits panels. Order at 24, *Texas v. EPA*, No. 23-60069, ECF 269-1 (5th Cir. May 1, 2023) ("*Texas 2023 Order*"); *Wallace v. FedEx Corp.*, 764 F.3d 571, 583 (6th Cir. 2014).

*RMS*, 64 F.4th at 1373; *see also S. Ill. Power Coop.*, 863 F.3d at 670. Restricting the action at issue to EPA's disapproval of Alabama's Submission would allow the nature of the petition to dictate venue, which multiple courts have rejected as improper under the Act. *See, e.g.*, *RMS*, 64 F.4th at 1373; *S. Ill. Power Coop.*, 863 F.3d at 670; *ATK*, 651 F.3d at 1199.

### B. EPA Properly Found and Published that the Disapproval is Based on Determinations of Nationwide Scope or Effect.

Alternatively, even if this Court concludes the Disapproval is locally or regionally applicable, venue still lies in the D.C. Circuit because the Disapproval is based on determinations of "nationwide scope or effect" made and published by EPA. *See* 42 U.S.C. § 7607(b)(1); Disapproval at 9380–81.

A locally or regionally applicable action must be challenged in the D.C. Circuit if (1) the action is "based on a determination of nationwide scope or effect" and (2) "the Administrator finds and publishes that such action is based on such a determination." 42 U.S.C. § 7607(b)(1). No one disputes EPA satisfied the second prong by making and publishing the requisite finding, Disapproval at 9380–81. The only question is whether the challenged "action" is "based on a determination of nationwide scope or effect." The answer is yes.

The "action" here is EPA's Disapproval as a whole, notwithstanding Petitioners' attempt – contrary to settled caselaw – to redefine the "action" to suit the specifics of their grievance. *RMS*, 64 F.4th at 1372–73; Arg. I.A.; *see also*

*Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) ("The 'action' is the rule or other *final action taken by the agency*") (emphasis added). As the statutory language makes clear, an action relies upon constituent determinations. 42 U.S.C. § 7607(b)(1); *see also Texas*, 829 F.3d at 419 (explaining determinations are "justifications the agency gives for the action" and "can be found in the agency's explanation of its action").

Per the statute's language – *i.e.*, "based on *a* determination" – if at least one determination underlying a "locally or regionally applicable" action has "nationwide scope or effect," and EPA publishes a corresponding finding, then venue belongs in the D.C. Circuit. 42 U.S.C. § 7607(b)(1) (emphasis added).[5] That such an action might also be based on determinations lacking nationwide scope or effect is irrelevant. Similarly, the statute does not require that such an action be based *solely* on a "determination of nationwide scope or effect." When Congress intends such a limitation, it creates one explicitly, as it did elsewhere in this very provision. *See* 42 U.S.C. § 7607(b)(1) (if a petition for review is "*based solely* on grounds arising after" the 60-day review window following publication of EPA's

---

[5] The Fifth Circuit's atextual distinction between "core" and "peripheral" determinations, *Texas*, 829 F.3d at 419, contravenes the statute's plain statement that *one* determination of nationwide scope or effect establishes venue in the D.C. Circuit.

action, the petition "shall be filed within [60] days after such grounds arise")
(emphasis added).

EPA made clear the Disapproval is in fact based on multiple determinations
of nationwide scope or effect.[6] *See* RTC at 392 (identifying determinations of
nationwide scope or effect). EPA explained that its "determinations . . . rest on the
same or highly similar grounds, across all of the states covered by this action," and
"Section V of the [Disapproval's] preamble presents consolidated responses to
comments on these cross-cutting issues," expressly noting "[a]ll of these
determinations have nationwide scope or effect." *Id.* For instance, EPA
determined: (1) it was appropriate for EPA to evaluate states' Good Neighbor
obligations using the 2016v3 modeling and recent monitoring information – the
best available information at the time of the Disapproval – rather than limiting its
review to the information available to states at the time of their submissions,
Disapproval at 9365–66,[7] and (2) a state's use of any alternative contribution
threshold must be adequately justified, and reliance on EPA's Threshold Memo

---

[6] This Court is not bound to follow the Fifth Circuit in reviewing EPA's finding *de novo. Texas*, 829 F.3d at 421. *Texas* relied on inapposite case law. Nonetheless, even under *de novo* review, EPA's finding should be upheld.

[7] *See also id.* at 9351–54 (displaying 2016v3 and violating-monitor results for all covered states), 9354 (declining to finalize disapproval action for Wyoming and Tennessee based on changes from prior modeling), 9357–58 (using this data to disapprove Minnesota and Nevada despite change from 2011-based modeling).

and EPA's significant impact level guidance do not provide adequate justification, *id.* at 9372–74.[8] These are just two examples of many. *See id.* at 9361–79; RTC at 392.

These determinations have nationwide scope and effect. Take EPA's determination to use the 2016-based modeling and recent monitoring information. This determination was nationwide in scope because it applied to all states' submissions addressed in the Disapproval. And the determination is nationwide in effect because it impacts the identification of which upwind states are "linked" and which downwind states may obtain relief from their emissions.

These determinations also reflect EPA's nationwide policy judgments and analysis on interstate pollution transport for the Ozone Standard, and EPA made them uniformly in reviewing submissions to avoid inconsistent or inequitable results. The Disapproval is based on these determinations, which "can be found in the Agency's explanation of its action."[9] *Id.*; *see* RTC at 391–93. The Sixth Circuit concluded EPA's "collective approach" to resolving these same interstate

---

[8] *See also id.* at 9354–60 (identifying states' failure to support use of alternative contribution threshold as basis for disapproving Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Ohio, Oklahoma, and Utah submissions).

[9] In Fifth Circuit parlance, these determinations "lie at the core of" the Disapproval. *See Texas*, 829 F.3d at 419.

obligations for 23 states – "even if viewed individually" – in the Good Neighbor

Plan was "based on determinations of nationwide scope or effect," and therefore

required transfer. *Kentucky FIP Order* at 8.

Furthermore, the concurrent petitions for review of the Disapproval in eight

regional circuits show the potential for inconsistent results. Consider, for example,

Petitioners' challenges to EPA's contribution-threshold determinations. Br. at 25–

36. Numerous petitioners in the other circuits have raised similar arguments. *See,*

*e.g.*, Kentucky Br. at 30–35, *Kentucky v. EPA*, No. 23-3216, ECF 48 (6th Cir. Oct.

10, 2023); Arkansas Br. at 29–32, *Arkansas v. EPA*, No. 23-1320, ECF 5305108

(8th Cir. Aug. 11, 2023); Oklahoma Br. at 41–43, 50–53, *Oklahoma v. EPA*, No.

23-9514, ECF 010110888654 (10th Cir. July 14, 2023); Texas Br. at 26–28, *Texas*

*v. EPA*, No. 23-60069, ECF 328 (5th Cir. May 30, 2023). These arguments should

be heard in a single court – the D.C. Circuit – rather than in multiple regional

circuits.

The legislative history of the "nationwide scope or effect" clause evinces a

clear congressional intent to centralize review of "national" SIP issues in the D.C.

Circuit and a recognition that, although SIP actions "usually involve issues

peculiar to the affected States, such actions sometimes involve generic

determinations of nationwide scope or effect." 41 Fed. Reg. 56767, 56768–69

(Dec. 30, 1976). Centralized review is particularly important for implementing the

Good Neighbor Provision for ozone. To safeguard the health and welfare of millions of people living in high-ozone areas throughout the country, the Provision requires EPA and the states to ensure that states' emissions do not contribute significantly to air quality problems in other states; it purposely does not confine analysis to any individual locality or region. *See EME Homer*, 572 U.S. at 495–96. Given the Good Neighbor Provision's interstate focus and the broad geographic scale associated with ozone pollution – which can travel "hundreds or thousands of miles away," Disapproval at 9372 – EPA's evaluation of the Ozone Standard Good Neighbor submissions considered complex, interwoven, and overlapping linkages between and among multiple states across the country, as illustrated below.[10]

---

[10] EPA, Interstate Pollution Linkages Under the Good Neighbor Plan, https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs#maps.



Moreover, this Court should not follow the *Texas 2023 Order*'s or the

*Kentucky Order*'s analysis. The split Fifth Circuit panel concluded the Disapproval

was not "based on a determination of nationwide scope or effect" because the SIP

disapprovals at issue there were based on state-specific, "intensely factual

determinations." *Texas 2023 Order* at 11–12; *see also Kentucky Order* at 5–6.

However, that panel did not address the fact that the Disapproval is *also* based on

determinations of nationwide scope or effect. *See generally Texas 2023 Order*.

These orders' reasoning therefore impermissibly adds a new word – "only," as in,

"based *only* on a determination of nationwide scope or effect" – into the Act. Such

a judicial revision would render the "determination of nationwide scope or effect"

clause meaningless. *See Kentucky Order* at 17 (Cole, J., dissenting). It would also "gut [Congress's] underlying policy" to centralize judicial review in cases like this, where "EPA applied a uniform national approach to evaluate state plans and ensure equity among them." *Texas 2023 Order* at 25, 29 (Douglas, J., dissenting). It is difficult to imagine what action could be a locally or regionally applicable action "based on a determination of nationwide scope or effect" if the Disapproval is not.

In sum, applying the only reasonable construction of the Act's text, purpose, and history, this Court should dismiss or transfer the petitions for review to the D.C. Circuit.

## II.     EPA Acted Within its Clean Air Act Authority.

### A.     EPA Must Review SIP Submissions for Compliance with the Act.

If the Court nevertheless determines it is the proper venue, it should deny the petitions. Congress gave EPA a critical oversight role to independently evaluate all SIP submissions to ensure they meet the Act's requirements, including the Good Neighbor Provision. Congress delegated to EPA – not the states – the responsibility for determining whether a SIP submission "meets all of the applicable requirements of" the Act. 42 U.S.C. § 7410(k)(3). EPA consequently cannot automatically defer to states' technical conclusions or interpretations of the Act.

Given that clear statutory language, Petitioners cannot rely on *Alaska Department of Environmental Conservation v. EPA*, 540 U.S. 461 (2004) ("*ADEC*"), to reduce EPA's role in the SIP context. *ADEC* concerned EPA's review of a state's "best available control technology" ("BACT") determination under an EPA-approved permitting program. 540 U.S. at 484. Congress delegated to "the permitting authority" the ability to determine BACT under that program. 42 U.S.C. § 7479(3). Even in that context, *ADEC* recognized EPA's oversight authority includes ensuring the permitting authority's BACT determination is "reasonably moored to the Act's provisions." 540 U.S. at 485. More importantly here, in the Good Neighbor Provision context, Congress tasked EPA directly with the duty to determine a SIP's adequacy, without deference to any other body. 42 U.S.C. § 7410(k)(3).

Despite EPA's critical oversight role, Petitioners contend EPA must defer to Alabama's judgments and approve the Submission so long as it "substantially compl[ies]" with the Act. Br. at 22, 30 (citing *City of Seabrook, Texas v. EPA*, 659 F.2d 1349, 1356 (5th Cir. 1981)). But whether a SIP complies with the Act is for EPA to determine. *See Ariz. ex rel. Darwin v. EPA*, 815 F.3d 519, 532 (9th Cir. 2016) (recognizing "Congress intended that EPA, not the states alone, ultimately ensure that state determinations . . . comply with the Act" and rejecting contention that "EPA bears the burden of proving that the State's BART determinations are

unreasonable") (citing *North Dakota v. EPA*, 730 F.3d 750, 761 (8th Cir. 2013));

*Oklahoma v. EPA*, 723 F.3d 1201, 1210 (10th Cir. 2013) ("EPA monitors SIPs for

compliance with the statute").

Moreover, Petitioners' argument that EPA must approve a SIP that

"substantially compl[ies]" with the Act – as opposed to fully complying – finds no

footing in the law. Rather, the Act requires that "the Administrator shall approve

[a] submittal as a whole if it meets *all* of the applicable requirements of this

chapter." 42 U.S.C. § 7410(k)(3) (emphasis added). Where only "a portion" of a

SIP meets "*all* the applicable requirements," Congress granted EPA discretion to

approve in part and disapprove in part such a submission. *Id.* (emphasis added).

However, by law, such a submission "*shall not* be treated as meeting the

requirements of [the Act] until [EPA] approves *the entire plan revision* as

complying with the [Act]." *Id.* (emphasis added).

Petitioners' reliance on *Seabrook*, Br. at 21–22, 30, for the proposition that

EPA must approve a SIP submission that "substantially comp[lies]" with the Act is

similarly misplaced. Preliminarily, *Seabrook* addressed whether EPA may issue a

"conditional approval" of a state's SIP submission. 659 F.2d at 1351. EPA

certainly "may" conditionally approve a submission *if* the state commits to making

discrete, identifiable changes to its SIP submission. *Id.* at 1357; 42 U.S.C.

§ 7410(k)(4). And "if the State fails to comply," "such conditional approval shall

be treated as a disapproval." 42 U.S.C. § 7410(k)(4). This authority is discretionary, *id.*, and EPA otherwise may only approve SIP submissions that "meet[] all of the applicable requirements." *Id.* § 7410(k)(3); *see also id.* § 7410(*l*) (prohibiting EPA from approving SIP revisions that interfere with any applicable requirement of the Act).

EPA's oversight role is particularly important in regulating interstate air quality – where states' emissions create pollution not just "within their borders," *North Dakota*, 730 F.3d at 760–61, but travel downwind and affect *other* states. *See EME Homer*, 572 U.S. at 495. The Good Neighbor Provision's applicable requirement is for states to "prohibit" emissions that significantly contribute to nonattainment or interfere with maintenance in any other state. 42 U.S.C. § 7410(a)(2)(D)(i)(I). As the Supreme Court has held, this requires EPA to ensure responsibility for downwind pollution is allocated among contributing upwind states. *EME Homer*, 572 U.S. at 515–16, 520. EPA's role – and the Provision itself – would be nullified if states could unilaterally dictate their own Good Neighbor obligations. Thus, contrary to Petitioners' claim that EPA seeks "to supplant [Alabama's] primary role," Br. at 24, EPA is actually fulfilling its statutorily-mandated oversight role to determine whether the Submission "meets all of the applicable requirements" of the Act. 42 U.S.C. § 7410(k)(3).

Petitioners' assertion that EPA must defer to *any* "reasoned analysis," Br. at 22, thus misses the mark. While states have discretion in formulating their SIPs, that does not mean EPA must defer to Alabama's determination that the Submission complies with the Act. *See Ariz.*, 815 F.3d at 532. EPA's determination in that regard involves the complex assessment of emissions, air quality, and monitoring data that is subject to deferential review. *See Miccosukee Tribe*, 566 F.3d at 1271 (quoting *Balt. Gas*, 462 U.S. at 103); *North Dakota*, 730 F.3d at 760–61, 772 (deferring to EPA's determination that a SIP submission contained methodological flaws and upholding EPA's disapproval); *Oklahoma*, 723 F.3d at 1217 ("Given that we must defer to the EPA's technical judgments, we cannot say the EPA acted arbitrarily on the basis of the record before us"); *Ass'n of Irritated Residents v. EPA*, 686 F.3d 668, 677 (9th Cir. 2012) (highlighting EPA's "affirmative duty" to ensure SIPs demonstrate attainment); *Catawba Cnty. v. EPA*, 571 F.3d 20, 41 (D.C. Cir. 2009) (giving an "extreme degree of deference to [EPA] when it is evaluating scientific data within its technical expertise"). These principles apply equally in the Good Neighbor context. *See Westar Energy v. EPA*, 608 F. App'x 1, 3 (D.C. Cir. 2015) (upholding Good Neighbor SIP disapproval noting EPA's handling of "technical matters within its area of expertise warrants particular deference").

## B. EPA Reasonably Disapproved Alabama's Submission.

Contrary to the arguments put forward by Petitioners, EPA's grounds for disapproving the Submission were well-reasoned, had ample record support, and adhered to EPA's longstanding policies in evaluating Good Neighbor obligations. EPA reasonably found Alabama did not provide adequate technical analysis to support its proposed adoption of a 1 ppb contribution threshold. Next, EPA examined Alabama's "weight-of-evidence" analysis and determined Alabama had neither proved that the state was not linked to Texas nor that the status quo was sufficient to satisfy Alabama's statutory obligations. In short, EPA found that Alabama contributed to out-of-state receptors and that the various arguments Alabama put forward failed to establish that no part of that contribution is "significant."

### 1. EPA reasonably rejected Alabama's application of a 1 ppb contribution threshold.

#### a. Alabama's Submission did not justify the use of a 1 ppb contribution threshold.

EPA properly determined that Alabama's use of a 1 ppb contribution threshold was not sufficiently justified by technical analysis. Disapproval at 9354; Proposal at 64423–24; RTC at 295–97. Nevertheless, Petitioners now argue EPA should have approved Alabama's selection of a 1 ppb threshold because it was "reasoned." Br. at 27–29. This is incorrect.

At the outset, Alabama's Submission did not offer *any* justification for a 1 ppb threshold. *See* Submission at 105–06. Rather, Alabama incorrectly claimed the Modeling and Threshold Memos determined that "the significance [*sic*] threshold can be set at 1 ppb." *Id.* at 106. The Submission also overlooked both memos' caveat that states' alternative approaches must have "adequate technical justification and [be] consistent with the requirements of the [Act]." Threshold Memo at 2; Modeling Memo at 3. Alabama then stated that the contribution threshold should match the PSD program's 1 ppb threshold. Submission at 106. The Submission did not provide any further analysis how the PSD program is relevant to the determination of a contribution threshold in the Good Neighbor context. *See id.* at 105–06. Thus, the Submission only provided conclusory statements to support using a 1 ppb contribution threshold.

Petitioners now double down on these unsupported claims. Br. at 27–29, 32. Petitioners argue Alabama's selection of a 1 ppb threshold "was plainly 'reasoned' and 'consisten[t] with the Act's requirements'" because the Threshold Memo indicated that "it may be reasonable and appropriate for states to use a 1 ppb contribution threshold." *Id.* at 27 (quoting Threshold Memo at 4). Petitioners next assert EPA "identifie[d] the [Act's] PSD program as relevant for determining screening thresholds." *Id.* at 28 (citing Modeling Memo at A-2). They add that

EPA's PSD program guidance indicates the term "contribute significantly" should require a higher threshold than that which is required by "contribute." *Id.* at 28–29.

None of these arguments is availing. First, EPA never concluded that a 1 ppb contribution threshold "*is* reasonable and appropriate." *Cf.* Threshold Memo at 4. Rather, EPA emphasized that the Threshold Memo "may not apply to the facts and circumstances underlying a particular SIP," so states should "ha[ve] adequate technical justification" for applying a 1 ppb threshold. *Id.* at 1–2.

Second, setting aside the fact that the Submission did not articulate Petitioners' PSD program rationale, *compare* Submission at 106, *with* Br. at 28–29, EPA never stated that the PSD program was relevant to establishing a contribution threshold. Rather, the Modeling Memo compiled *outside stakeholders*' ideas for "identify[ing] potential flexibilities" and solicited feedback on those potential flexibilities in Attachment A. Modeling Memo at A-1. In fact, EPA has long held the position that the PSD program's "significant impact level" guidance is *not* relevant to determining a Good Neighbor contribution threshold because the programs fulfill different statutory purposes. Disapproval at 9372 (citing 70 Fed. Reg. 25162, 25190–91 (May 12, 2005); 76 Fed. Reg. 48208, 48237 (Aug. 8, 2011)). EPA reiterated that long-held position here. *See* Disapproval at 9372; Proposal at 64423–24.

Specifically, the PSD program applies to areas that are already in attainment and helps determine whether a potential new emission source can be constructed at all. Disapproval at 9372. Even if a proposed new source would emit under the "significant impact level" threshold, it is still obligated to install the best available control technology and meet related permitting requirements. *See id.*; Proposal at 64423–24 & n.58. Furthermore, the PSD program uses a different threshold metric: a maximum single-day 8-hour contribution. Disapproval at 9372. In contrast, the Good Neighbor Provision's contribution threshold relies on a multi-day average to capture variations in contribution. *Id.* Thus, using a 1 ppb threshold based on the *single* highest day of contribution would actually cause more states to be linked, not less. *Id.* Given these differences between the PSD program and the Good Neighbor Provision, the PSD Program's significant impact level threshold is not analogous to the Good Neighbor Provision's determination of when contribution is "significant."

Given the Submission's dearth of any analysis, EPA's determination that Alabama's Submission lacked a factual basis, much less "adequate technical justification," to support a 1 ppb threshold was reasonable. *See North Dakota*, 730 F.3d at 761 (upholding disapproval of a SIP lacking "sufficient factual basis").

### b. Petitioners' comments also did not adequately justify the use of a 1 ppb contribution threshold.

EPA also reasonably rejected Petitioners' subsequent attempts to justify a 1 ppb threshold. Petitioners commented on EPA's Proposal. EPA-R04-OAR-2021-0841-0033 ("Alabama Comments"); EPA-R04-OAR-2021-0841-0034 ("Industry Comments"). EPA determined the comments' explanation did not justify applying a 1 ppb threshold for multiple reasons. RTC at 295–97; Disapproval at 9354.

Petitioners now accuse EPA of acting arbitrarily and capriciously because their comments emulated the multi-factor analysis EPA provided in a proposal to approve a 1 ppb contribution threshold for Iowa's SIP. Br. at 33–36. However, EPA's rejection of Petitioners' multi-factor analysis is fully consistent with EPA's actions on the Iowa SIP submission. RTC at 296.

First, EPA *withdrew* the Iowa SIP proposal and did not use a 1 ppb contribution threshold to approve Iowa's SIP. *Id.*; 87 Fed. Reg. 9477, 9483 (Feb. 22, 2022). Thus, the analysis in that proposal did "not constitute a final agency policy or precedent on how a state-specific, 1 ppb-threshold analysis should be conducted." RTC at 296.

Second, EPA explained that some aspects of its proposed Iowa analysis were inconsistent with longstanding Good Neighbor policy. In particular, one factor relied on incidental benefits that would accrue to a receptor from *other* states' emission-reduction efforts. *Id.* EPA explained this would not be a proper basis on

which to approve a state's use of a higher threshold, since it makes attainment dependent on incidental, hypothetical benefits. *Id.* (citing 81 Fed. Reg. 74504, 74550 (Oct. 26, 2016)). Here, Alabama assumed Arkansas would implement emissions reductions for the benefit of receptors to which Arkansas is linked above 1 ppb, which might then incidentally benefit a Texas receptor to which both states are linked. *Id.* In reality, Arkansas's submission did *not* propose to implement any emissions reductions. Disapproval at 9355.[11]

Third, EPA nonetheless evaluated Petitioners' analysis of the Iowa factors and found they did not support a 1 ppb threshold. Specifically, EPA observed that a 1 ppb threshold for the Texas receptors to which Alabama was linked in the 2016v2 modeling would cause a loss of 18 to 19 percent of total upwind-state contribution (and 25 percent if Arkansas's contribution was also removed), more than twice the amount identified as potentially acceptable in the Threshold Memo. RTC at 296.[12] EPA observed that similarly large losses in upwind-state

---

[11] This problem persists with Alabama's linkages under the 2016v3 modeling. States linked to Denton and Galveston also argued that the status quo satisfies their Good Neighbor requirements. EPA-HQ-OAR-2021-0663-0085 at C-2–C-5; Disapproval at 9356–58 (Louisiana, Mississippi); 87 Fed. Reg. at 9559–60 (Tennessee).

[12] Petitioners' claim that there will only be a 4% loss from Alabama is inconsistent with the Threshold Memo, which considered loss from *all* linked states. *Compare* Threshold Memo at 3 (analyzing "sum of the contributions from all upwind states"), *with* Br. at 35.

contribution would occur under the 2016v3 modeling. RTC at 296–97. EPA

reasonably found that degree of loss unacceptable, and that finding was entirely

consistent with the metric used in the Threshold Memo. *Compare* Threshold

Memo at 4 (contemplating 7% loss "when summed across all receptors"), *with* Br.

at 34 (claiming EPA is using a "brand-new metric").

EPA thus properly determined that Alabama's application of a 1 ppb

threshold did not adequately address upwind-state contributions to Texas's ozone

levels and was inadequately justified.[13]

### c. EPA's rejection of a 1 ppb contribution threshold comports with the Threshold Memo.

As discussed, EPA made abundantly clear it did not endorse a 1 ppb

contribution threshold without adequate justification. *See* Threshold Memo at 1, 4.

Nevertheless, Petitioners now claim "EPA previously found a 1 ppb threshold to be

appropriate, and Alabama reasonably relied on EPA's guidance in that respect."

Br. at 29. This claim is flawed for two reasons.

First, Petitioners' claim misreads the Threshold Memo, which only found

that a 1 ppb threshold "*may be* reasonable and appropriate" where states "ha[ve]

---

[13] Petitioners claim that EPA required states to provide a "compelling policy reason" to use a 1 ppb contribution threshold. Br. at 30–31 (citing Disapproval at 9373–74). Rather, EPA merely stated it found no compelling reason to adopt a universal 1 ppb contribution threshold. *See* Disapproval at 9374.

adequate technical justification." Threshold Memo at 2, 4 (emphasis added). As discussed, EPA thoroughly explained why it found Alabama's use of a 1 ppb contribution threshold inappropriate for Alabama's specific circumstances, for reasons entirely consistent with the Threshold Memo.

Second, in any event, the State does not support its claimed reliance interests. It did not identify any incurred compliance costs or meaningful commitment of resources in developing circumstance-specific arguments to support Alabama's use of a 1 ppb contribution threshold. *Dep't of Homeland Security v. Regents*, 140 S. Ct. 1891, 1914 (2020) (identifying reliance interest where recipients "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on the program); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222–23 (2016) (finding reliance interest in decades-long federal policy because industry applied the policy when negotiating and structuring compensation plans); Disapproval at 9373 (noting it was not clear any states invested much of their own resources to develop circumstance-specific arguments to support 1 ppb threshold).

EPA's rejection of Alabama's proposed 1 ppb contribution threshold was therefore consistent with the Threshold Memo and reasonable.

## 2. EPA reasonably rejected Alabama's "weight-of-evidence" analysis.

Consistent with EPA's explanation that it "evaluated each SIP submission on its merits," *see, e.g.*, Disapproval at 9363, EPA considered whether the Submission's purported "weight-of-evidence" analysis satisfied Alabama's Good Neighbor obligations. RTC at 303–05; Proposal at 64421–26. This examination revealed technical deficiencies and flaws that undermined the Submission's conclusions. RTC at 303–05; *see also* Disapproval at 9354–55. Thus, EPA reasonably rejected Alabama's analysis, which was inadequately supported and contrary to the evidence before it.

### a. EPA reasonably relied on its modeling to evaluate Alabama's Submission.

Historically, courts have upheld EPA's modeling choice where there is a "rational relationship between the model and the known behavior of the . . . air pollutant to which it is applied." *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994). Courts should not "invalidate EPA's predictions solely because there might be discrepancies between those predictions and the real world. That possibility is inherent in the enterprise of prediction." *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 135 (D.C. Cir. 2015). As this Court recognizes, "when an agency 'is making predictions, within its area of special expertise, at the frontiers of science . . . as opposed to simple findings of fact, a

reviewing court must generally be at its most deferential.'" *Miccosukee Tribe*, 566

F.3d at 1264 (quoting *Balt. Gas*, 462 U.S. at 103).

EPA's modeling here is reliable. EPA has long used modeling to evaluate

states' Good Neighbor obligations. RTC at 186–87. Consistent with past practice,

EPA considered Alabama's Submission, EPA's 2016v2 and 2016v3 modeling, as

well as data measured by monitoring sites when evaluating the Submission. *Id.* at

199; Disapproval at 9349–50. Notably, EPA reran its 2016v2 modeling in response

to comments and new information to produce the 2016v3 model. Disapproval at

9339. EPA found that the 2016v3 modeling performed within generally accepted

parameters. RTC at 187. Based on all this information, EPA concluded that

Alabama was linked to two Texas receptors. Disapproval at 9354.

Petitioners seek to dismiss the 2016v2 modeling and Alabama's linkages by

claiming a 0.70 ppb contribution threshold would fall within the model's bias and

error ranges, and therefore contributions at or below that level could not be

adequately modeled. Br. at 44–46; *see also* Submission at 105. Alabama

specifically asserted in its "weight-of-evidence" analysis that the 2016v2 model's

bias and error rates ranged from "+/-2.9 to 6.1 ppb in the southeast and +/-7.8 to

9.1 ppb in the south." Submission at 105. Petitioners further imply the variation in

Alabama's linkages under EPA's modeling indicates the modeling is inaccurate.

Br. at 44.

Initially, Petitioners misconstrue the 2016v2 model's actual bias and error rates. To clarify, the 2016v2 model's "average bias was -2.9 ppb in the Southeast region and -7.8 ppb in the South region." Proposal at 64423. The model's average error rate "was 6.1 ppb in the Southeast and 9.1 ppb in the South." *Id.* Based on these bias and error rates, the 2016v2 model "tended to *under-predict* actual ozone levels at monitoring sites in these regions." *Id.* (emphasis added). Moreover, EPA improved the 2016v2 model's accuracy by addressing certain commenter-identified model performance issues. EPA-HQ-OAR-2021-0663-0085 at 31 ("the [2016v3] model has less bias and error regionally . . . using these updates."); RTC at 187 ("the performance of our modeling is within the generally accepted performance parameters for modeling of this type.").

In fact, EPA's modeling and contribution calculations are consistent with agency modeling guidance and have been used across many rulemakings. Disapproval at 9371–72; RTC at 243. Here, EPA explained Petitioners' concerns inappropriately "compare the bias/error involved in the estimation of *total* ozone" at a single receptor "to the potential error in the estimation of the subset of ozone that is contributed by a single state." Disapproval at 9370. Further, while the projected ozone value may differ by a small amount from the measured ozone value, that discrepancy is "a relatively small percentage of the *total* modeled ozone, which for a receptor of interest would be on the order of 70 ppb," so it

would be "unrealistic to assign all of [such] discrepancy . . . to the estimated impact from a single state because the [discrepancy] would be the combination of the error from *all sources of ozone that contribute to the total*," not just one upwind state's contribution. *Id.* at 9370–71 (emphasis added). As such, EPA reasonably relied on its modeling in considering the Submission. *See Chem. Mfrs. Ass'n*, 28 F.3d at 1265.

Furthermore, after applying its longstanding technical expertise in modeling air pollution, EPA concluded that the fact that Alabama remained linked to Texas through all three rounds of the 2016-based modeling supports a finding that Alabama's emissions contribute to Texas ozone levels. *See* RTC at 201. Each round of EPA's modeling incorporated updated data, and Alabama remained linked "under varying assumptions and meteorological conditions." *Id.* at 200–01. Petitioners' complaints regarding EPA's modeling therefore lack merit.

### b. Alabama's Submission confirms that Alabama is linked to downwind receptors.

Petitioners further argue Alabama should not be linked to Texas because wind rarely travels from Alabama to Texas. Br. at 41. Petitioners base this argument on Alabama's meteorological and back trajectory analyses of 31 days over a two-year period. *Id.* (citing Submission at 107–45).

However, EPA identified two flaws in Alabama's analysis. Proposal at 64424–25; *see also* Disapproval at 9354. First, the meteorological analysis focused

solely on comparing ozone levels between Alabama and Texas. Proposal at 64424. The analysis consequently failed to account for the fact that downwind ozone levels are more directly affected by the transport of ozone precursors (like nitrogen oxides and volatile organic compounds) rather than the transport of ozone itself. *Id.* Ozone is not emitted directly into the air, but forms when precursor emissions interact in the presence of sunlight. *Murray*, 936 F.3d at 605. This means "sources and other emissions activities in [Alabama] nonetheless may be emitting ozone-precursor emissions in amounts sufficient to contribute ozone . . . to [a] high-ozone event" in Texas regardless of Alabama's own ozone levels, particularly because ozone precursors can travel long distances, especially overnight. Proposal at 64424; RTC at 357–58; *see also Miss. Comm'n on Envtl. Qual.*, 790 F.3d at 147.

Second, Alabama's reliance on its back trajectory analysis – examining only 31 days over a two-year period – to dispute the 2016v2 modeling gives more weight to the back trajectory analysis than can be technically justified. Proposal at 64424–25; *see also* RTC at 360–61. Specifically, back trajectories have limited utility because they only show an air parcel's movement's centerline, with greater uncertainty the further back in time the trajectory goes. RTC at 360. Thus, examining only the centerline overlooks whether precursor pollutants are picked up from Alabama on either side of the centerline and transported into Texas. *See id.* Alabama's Submission also did not analyze the breadth of the moving air

parcels. Submission at 104, 107–45. Additionally, back trajectory analysis cannot account for chemical dispersion and therefore cannot quantify downwind contributions to ozone. RTC at 363. In contrast, EPA's highly-sophisticated photochemical grid modeling using CAMx is designed specifically to quantify an upwind state's contribution to ozone pollution in a downwind state. *See id.* at 186–87; *see also* Disapproval at 9352–54.

Setting aside these limitations, EPA's own back trajectory evaluation confirmed the results of 2016v2 and 2016v3 modeling and indicated that Alabama is linked to Texas. RTC at 358–59.

<div align="center">

**c.** **The Submission lacks evidence to support its conclusion that no further cost-effective emissions controls are available.**

</div>

Next, Petitioners contend that even if Alabama is linked to Texas, the Submission showed Alabama's emissions are well-controlled, so Alabama's contributions cannot be "significant." Br. at 39–41 (citing Submission at 81–82, 101, 104–05).

To the contrary, EPA found the Submission offered only general, unsupported assertions to claim Alabama's emissions will not significantly contribute to Texas. Proposal at 64425–26; *see also* Submission at 104–06. The Submission did not provide any technical analysis to support this claim. RTC at 320. Specifically, Alabama claimed an evaluation of potential emission reductions

should first examine mobile source controls because mobile sources constitute Alabama's largest source of precursor emissions. Submission at 105. Alabama added – without evidence – that its mobile source emissions remain local. *Id.* at 104–05. Alabama also suggested – without evidence – that its mobile source emissions will decline. *Id.* at 105. Finally, Alabama asserted emissions from its EGUs have declined and that "the overwhelming majority" of its power plants are "fully controlled." *Id.*

None of these assertions establishes that Alabama's emissions do not significantly contribute to downwind receptors. While Alabama suggested mobile source emissions should be evaluated first, Alabama could have – but did not – provide any such evaluation. Disapproval at 9377–78; *see also* Submission at 104–05. Lacking any such evaluation, the Submission does not address the key question of whether "any source or other type of emissions activity" contributes significantly to downwind receptors. Disapproval at 9377; 42 U.S.C. § 7410(a)(2)(D)(i)(I). Further, Alabama failed to analyze whether its stationary source emissions could be cost-effectively reduced. Disapproval at 9354. Instead, the Submission proclaimed that EGU emissions are "already fully controlled." Submission at 105. But the Submission did not support this conclusion. *See id.* In fact, the record shows that at least some emissions reductions are available at three units. RTC at 346. Regardless, Alabama's assertion was limited to EGUs and did

not consider whether any other stationary emission sources could cost-effectively reduce their emissions. *See id.* at 359 ("It is the state's responsibility to identify and then prohibit *any source or other type of emissions activity* from emitting any pollutant in amounts which will contribute significantly to nonattainment or interfere with maintenance in other states") (emphasis added).

> **d.** **Industry Petitioners' state-level comments also do not support the Submission's conclusion that no further cost-effective emissions controls are available.**

Petitioners now seek to retroactively bolster Alabama's Submission by pointing to Industry Petitioners' comments submitted to Alabama during the Submission's development at the state level ("state-level comments"). Br. at 33–34, 40, 44, 50–52 (citing Submission at 81–89). However, EPA reasonably determined that Alabama's Submission did not rely on the state-level comments' analysis that, regardless, did not support the Submission's conclusions. *See* RTC at 297, 346.

Alabama's inclusion of the state-level comments in the Submission does not indicate that Alabama intended to rely on the state-level comments to justify its Submission. Rather, their inclusion was simply required by the Act's implementing regulations. 40 C.F.R. pt. 51 Appx. V 2.1(h) (requiring a "[c]ompilation of public comments"). Alabama could and should have made clear if it intended to rely on the state-level comments to justify its Submission. For instance, Alabama

explained it "ma[de] a modification to the proposed plan" by adding one statement (unrelated to the issues here) in response to Industry Petitioners' state-level comments. Submission at 76. Alabama did not make any further statements to adopt the state-level comments nor respond to or explain its views on the remainder of Industry Petitioners' state-level comments or the other comments it received.

Moreover, EPA explained in the Proposal that it "will treat Alabama's [Submission] as not relying on the legal, technical, or policy arguments provided in comments except as expressly stated by Alabama." Proposal at 64421. Even then, Alabama's comments did not adopt the state-level comments to support the Submission or otherwise dispute EPA's position. *See generally* Alabama Comments. Alabama's silence in the face of EPA's statement is indicative that Alabama did not consider the state-level comments to be incorporated into the SIP. *See Sierra Club v. EPA*, 939 F.3d 649, 672 (5th Cir. 2019) ("Based on [Louisiana's] express disavowal, we cannot conclude that the analyses [an industry group] and the EPA submitted to the [state] were incorporated into the terms of Louisiana's revised SIP."). That same silence belies Petitioners' current litigation position. Further, Petitioners' assertion that EPA should have approved the Submission based on the state-level comments violates the basic administrative law principle that an agency action "must be upheld . . . on the basis articulated by

the agency itself." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50 (1983). Consequently, EPA's conclusion that the Submission did not rely on Industry Petitioners' state-level comments is reasonable. *See* RTC at 297.

Even if Alabama had intended to adopt the state-level comments to support its Submission, EPA reasonably determined the state-level comments also did not provide adequate analysis. Industry Petitioners pointed to EPA's proposed federal plan's data to argue that only three EGUs were "potentially eligible for cost-effective controls." Submission at 87. Industry Petitioners then claimed that none of these units could reduce their emissions any further because they are "either already controlling [precursor] emissions in a cost-effective manner, or will have changed to lower emitting fuel prior to the 2023 ozone season." *Id.*

However, these claims simply do not demonstrate that all cost-effective emissions controls have been mandated such that there are no further emissions control opportunities in Alabama. Notably, the Act requires SIPs to "include enforceable emission limitations and other control measures." 42 U.S.C. § 7410(a)(2)(A); *see also Ala. Envtl. Council*, 711 F.3d at 1280. This allows both states and EPA to ensure that identified emission reductions occur. *See* 42 U.S.C. § 7410(a)(2)(C); Disapproval at 9376. Thus, even assuming the three EGUs had lowered precursor emissions or might change to a lower emitting fuel, Alabama's Submission should have included provisions to enforce these controls and changes.

*Ala. Envtl. Council*, 711 F.3d at 1280; *see also* RTC at 346. Furthermore, Industry Petitioners' focus on EGUs entirely failed to consider whether other emissions sources might have cost-effective emission reductions available. RTC at 346. And, as EPA explained, whether Alabama may have many or just a few cost-effective emissions controls available, Industry Petitioners' "anecdotal" claims that there were *none* was both unsupported and insufficient. *Id.*

Thus, Alabama's Submission failed to provide sufficient analysis to show that the state had "prohibited" emissions that significantly contribute to nonattainment or interfere with maintenance in another state, even if the state-level comments are part of the Submission.

## III. If the Court Holds for Petitioners, the Appropriate Remedy is Remand without Vacatur.

The Court should uphold EPA's Disapproval. But if the Court finds some error, vacatur would be inappropriate. *Contra* Br. at 61. Instead, the Court should remand to EPA while allowing the Disapproval to remain in place pending prompt completion of remand proceedings.

This Court recognizes that remand without vacatur can be an appropriate remedy. *Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). In evaluating whether to vacate an agency action, this Court considers "the seriousness of the [action's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an

interim change that may itself be changed." *Id.* (quoting *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). An "inadequately supported rule . . . need not necessarily be vacated." *Allied-Signal*, 988 F.2d at 150.

Here, both factors show that remand without vacatur would be proper. First, Petitioners primarily allege procedural defects and record-based errors that EPA could address and correct on remand. If the Court concludes EPA should have provided a more comprehensive explanation, EPA could do so on remand.

Second, vacatur would delay EPA's efforts to implement the Good Neighbor Provision as expeditiously as practicable and would hinder downwind states' efforts to attain the Ozone Standard. *See Maryland*, 958 F.3d at 1203–04. Without the Disapproval, EPA would lack the authority to implement the Good Neighbor Plan for Alabama. EPA issued the federal Plan to address the outstanding Good Neighbor obligations of 23 states and to help downwind states attain the Ozone Standard. Judicial stays have blocked the Good Neighbor Plan in 12 states, including Alabama, allowing their sources to avoid compliance. Meanwhile, sources in 11 upwind states remain subject to the Plan and are working to meet their obligations, and downwind areas are subject to increasingly onerous statutory requirements under the Act's nonattainment planning provisions. *See* 87 Fed. Reg. at 60900. As the Supreme Court recognized, this is not how the Good Neighbor

Provision is supposed to work. "Left unregulated, the emitting or upwind State reaps the benefits of the economic activity causing the pollution without bearing all the costs." *EME Homer*, 572 U.S. at 495.

Lifting the stay would allow EPA to implement the Good Neighbor Plan for Alabama, with real health benefits to communities in Texas. The Plan would encourage better emissions performance from power plants and other emission sources, leading to health benefits vastly outweighing its compliance costs. *See* 88 Fed. Reg. at 36737 (showing achievable nitrogen oxide emission reductions at Alabama's power plants), 36747 (showing resulting improvements in air quality), 36850–51 (quantifying resulting health benefits).

Out of concern for public health and the environment, courts historically have not vacated EPA actions implementing the Good Neighbor Provision when remand is appropriate. *See, e.g.*, *Wisconsin*, 938 F.3d at 336 ("we do not vacate regulations when doing so would risk significant harm to the public health or the environment."); *see also North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008). Thus, to the extent the Court determines remand is proper, it should remand without vacatur.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the petitions for review, transfer them to the D.C. Circuit, or deny them.

Respectfully submitted,

OF COUNSEL:                          TODD KIM
                                     Assistant Attorney General
ROSEMARY HAMBRIGHT KABAN
DANIEL P. SCHRAMM                    /s/ Albert Lin
U.S. Environmental Protection        ALBERT LIN
     Agency                          MIRANDA M. JENSEN
Office of General Counsel            U.S. Department of Justice
Washington, D.C.                     Environment & Natural Resources
                                          Division
                                     Environmental Defense Section
                                     P.O. Box 7611
                                     Washington, D.C. 20044
                                     (202) 514-2741
                                     albert.lin@usdoj.gov

DATE: November 20, 2023              *Counsel for Respondents*

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Respondents' Brief complies with Fed. R. App. P. 28(b) and 32(a)(7)(B), (f), and (g), as it complies with typeface requirements and contains 12,996 words, excluding exempted portions.

Date: November 20, 2023        */s/ Albert Lin*
ALBERT LIN

*Counsel for Respondents*

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing Respondents' Brief and Certificate of Interested Persons was filed with the Clerk of the Court using the CM/ECF system, which will send notification of said filing to the attorneys of record, who are required to have registered with the Court's CM/ECF system.

Date: November 20, 2023        */s/ Albert Lin*
ALBERT LIN

*Counsel for Respondents*